923 So.2d 460 (2006)
Michael SEIBERT, Appellant,
v.
STATE of Florida, Appellee.
No. SC03-800.
Supreme Court of Florida.
February 16, 2006.
Rehearing Denied May 4, 2006.
*463 Bennett H. Brummer, Public Defender and Scott W. Sakin, Special Assistant Public Defender, Eleventh Judicial Circuit, Miami, FL, for Appellant.
Charles J. Crist, Jr., Attorney General, Tallahassee, FL and Sandra S. Jaggard, Assistant Attorney General, Miami, FL, for Appellee.
PER CURIAM.
We have on appeal a judgment of conviction of first-degree murder and a sentence of death. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons that follow, we affirm the conviction and sentence of death.

FACTS
The evidence presented at the trial of appellant Michael Seibert revealed the following. On March 16, 1998, Karolay Adrianza, an eighteen-year-old high school student, was picked up from her home by Danny Korkour Navarres at approximately 10 p.m. The Navarres and Adrianza families were friends, and according to the trial testimony of Adrianza's sister, Adrianza and Navarres had been dating. Adrianza's sister also testified that Adrianza and Navarres had planned to go out in Miami Beach on the evening of March 16.
On March 16, William "Ace" Green, who had lived with Michael Seibert for approximately three weeks, left Seibert's apartment at 1136 Collins Avenue in Miami Beach at approximately 10:30 p.m. Green testified that Seibert was the only person in the apartment at the time he left. When he returned a few hours later, at about 12:30 a.m., Adrianza and Navarres were at the apartment with Seibert. Green recognized the two because he had seen them at the apartment several times in the prior week. Green testified that the three of them were using cocaine when he arrived at the apartment, and they each continued to use cocaine in equal amounts throughout the night. Green snorted one line of cocaine and estimated that the other three consumed all together more than an eight ball (three and a half grams) of cocaine throughout the night. Testimony at trial revealed that the cocaine was likely "cut," or diluted, with Lidocaine.
Green testified that he thought that Seibert was interested in Adrianza because of the way Seibert acted around her. He stated that there was some rivalry between Navarres and Seibert because both were flirting with Adrianza, but he could *464 not point to any specific examples to demonstrate this rivalry.
At about 3 a.m., Navarres and Green left in Navarres' car to get beer and cigarettes after Seibert asked Green to go and Navarres offered to drive. The errand took approximately five to ten minutes, and upon their return, Navarres dropped Green off at the apartment building, explaining that he had another place to go and that he would return later. When Green returned to the apartment, Adrianza asked where Navarres was, and upon learning that he had left, began using the apartment phone continuously, apparently in an attempt to reach Navarres. Evidence at the trial revealed that Seibert's phone was used to dial Navarres' cell and home phones nearly 100 times between 3:09 a.m. and 5:48 a.m. A half hour later, Seibert asked Green to go downstairs in the apartment building and to call him if he saw Navarres return. Green went downstairs and looked around, and then returned to the apartment.
At around 4 or 5 a.m., Seibert asked Green to leave to give him some time alone with Adrianza. Green left and went to a laundry where a friend of his worked, which was located behind the apartment building. Green proceeded to call Seibert at home and on his pager five or six times in an attempt to convince Seibert to let him return to the apartment. At some point, Green spoke with Seibert. Green testified that Seibert told him to relax and then indicated that he needed a few more minutes with Adrianza because he thought he had an opportunity to have intercourse with her.
At 6:30 a.m., Marsha Hill, who lived below Seibert, heard a noise like someone was rolling on the floor in Seibert's apartment. This noise lasted for about six to seven minutes. A minute or so later, Hill heard a female voice scream for help twice.[1] Green left the laundry sometime between sunrise and 8:15 a.m. and went back to the apartment a few times. He testified that he would knock on the door and make calls from the payphone outside of the apartment building, but Seibert refused to let him in. Seibert's next-door neighbor, Jeanette Sosa, testified that at around 7:15 a.m., she left her apartment for work and saw Green outside the door of Seibert's apartment. Green asked her whether Seibert was home and told her that he had been knocking on Seibert's door for some time.
Arcelis Korkour, Navarres' aunt, with whom he was living in March of 1998, testified that three calls were received at her house in the early morning of March 17, 1998. At 5 a.m., following the third call, she called the number from which she had received the calls, and her husband spoke with the person who answered the phone, whom he identified as an American male. Then a woman got on the phone, identifying herself as "Patricia," but Korkour testified that her husband recognized the voice to be that of Adrianza. After her husband hung up the phone, he went to check on Navarres. Korkour testified that his bedroom door was locked from the inside and that Navarres always locked it when he was home but would leave it open when he was out. She testified that Navarres did not open the door when her husband knocked.
On Green's final attempt to speak with Seibert and enter the apartment much later that morning, Seibert asked him to leave and buy cigarettes. When Green refused, Seibert began to act erratically and stated that Green looked crazy and that he did not want to open the door for *465 Green. Seibert then told Green that he (Seibert) was crazy and was going to kill himself. After this conversation, at 10:55 a.m., Green called 911.
At 11 a.m., Miami Beach Police Department (MBPD) Officer Douglas Bales and Sergeant Howard Zeifman were dispatched to Seibert's apartment in response to the 911 call from Green. When the officers arrived, they spoke with Green, who was waiting on the sidewalk in front of the apartment building when the officers arrived. Green led them to the apartment that he shared with Seibert, which was on the second floor of the building. The officers knocked on Seibert's door and, after realizing that someone was in the apartment, told Seibert that they had received a suicide call and that they had to see that he was all right. After four or five minutes of knocking on the door by the officers, Seibert opened the door approximately three or four inches so that the officers could only see Seibert's torso but not his arms or his legs. Seibert told the officers that he was okay and that they could leave. He then shut the door. The officers decided to knock again because they had not fully seen Seibert. After another two to three minutes of the officers attempting to persuade Seibert to open the door, Seibert again opened the door. Sergeant Zeifman stuck his baton in the door so that Seibert could not shut it again, and the officers entered the apartment. The officers told Seibert to sit down on a bed in the studio apartment. Officer Bales testified that he wanted to ensure that Seibert was alone, so when he asked Seibert whether anyone else was in the apartment, he backed up, glancing around to ensure that there was no one else in the room. As he was backing up, he saw, to his right and through the bathroom door that was slightly open, a severed foot on the edge of the bathtub. He shouted to Sergeant Zeifman a signal indicating that there was a homicide, and Seibert ran out of the apartment. The officers were able to apprehend Seibert in the hallway and placed him under arrest.
After Seibert was taken to the police station, he stated that he was not under the influence of drugs or alcohol. He also told Detective Michael Jaccarino that Navarres had nothing to do with the crime. He said at one point that there were other people in the apartment who had knocked him out and that he did not know what had happened. When he was told that he was under arrest for murder, Seibert said that he had messed up and then stated, according to Detective Jaccarino, "I guess I am going to prison."
Dr. Emma Lew, the Deputy Chief Medical Examiner for Miami-Dade County, examined the scene of the murder on March 17. The victim's body, later identified as Adrianza, was in the bathtub. Dr. Lew testified that although the bathtub area was very bloody, the rest of the bathroom was clean, and that the rugs, trash can, soap, and a plant from the bathroom were placed in a closet. Most of the soft tissue from the waist down had been removed from the body. Also, parts of the abdominal wall and the bowels were gone. The police did not recover any of these portions of the body, and the State theorized in its closing statement that Seibert had flushed these body parts down the toilet. The left hand, left foot, and left ankle had been severed from the body. Adrianza was approximately five feet tall, and Dr. Lew estimated that she weighed between 140 and 150 pounds before her murder. Her body weighed 101 pounds after it was recovered from the crime scene. Dr. Lew determined the cause of death to be mechanical asphyxiation caused by the killer's hands, although a shoelace and blue thread were wrapped around Adrianza's neck. There was a large knife that had been *466 placed in the chest of the victim's body, although Dr. Lew testified that this was most likely done after the victim's death. The victim had blunt trauma injuries to her head, eyes, mouth, ears, back, and arms. There were also many sharp force injuries on the body, but Dr. Lew could not determine whether those injuries occurred before or after death. The time of death was estimated to have been between 4:30 a.m. and 9 a.m. on March 17.
Jennifer McCue, a forensic DNA analyst who worked for the Florida Department of Law Enforcement (FDLE), testified that there was a significant amount of semen in the victim's vaginal slides, cervical slides, vaginal swabs, and cervical swabs. This semen was consistent with Seibert's DNA sample. Seibert had blood on the jeans he was wearing when he was arrested that was consistent with Adrianza's DNA. A fingernail scraping performed on the victim revealed material which was consistent with the victim's DNA, and no material matching Seibert's. Adrianza had a blood alcohol concentration of .05 percent and also had a breakdown product of cocaine in her blood.
Seibert's theory of the case at trial was that Navarres actually killed Adrianza. Korkour, Navarres' aunt, testified that Navarres' parents came from Venezuela upon learning about what had happened to Adrianza, and took Navarres back to Venezuela with them about a week after the murder. Korkour stated that she had not been able to reach Navarres since he left for Venezuela. Navarres never provided DNA samples, although he was fingerprinted and questioned. His car was searched, and nothing of evidentiary value was discovered. Chris Whitman, a crime laboratory analyst with FDLE, testified that all of the exhibits submitted, including several items from the apartment unrelated to the murder, were consistent with the DNA samples provided by Green, Seibert, and Adrianza, and there were no foreign DNA profiles present.
A jury convicted Seibert of first-degree murder. The trial court subsequently conducted the penalty phase of Seibert's trial, during which both sides presented evidence. The jury recommended by a nine-to-three vote that Seibert be sentenced to death. The trial court followed the jury's recommendation and imposed a death sentence, finding and weighing two aggravating factors[2] and six nonstatutory mitigating factors.[3]State v. Seibert, No. 98-8943 (Fla. 11th Cir. Ct. order filed Mar. 24, 2003) (sentencing order).
Seibert appeals his first-degree murder conviction and the trial court's sentence of death, raising six issues.[4]

*467 ISSUE 1. CONSTITUTIONALITY OF SEARCH
In his first claim in this appeal, Seibert asserts that the trial court erred in denying his motion to suppress all evidence discovered at his apartment and all statements made as a result of that discovery because the officers' entry into the apartment and subsequent search were in violation of the Fourth Amendment. In his 911 call, Green claimed that Seibert had locked him out of the apartment all morning and that the last time Green knocked on the door, Seibert threatened to commit suicide. Two MBPD officers arrived at the apartment a short time after receiving the call about an attempted suicide.[5] Officer Bales arrived first and testified that he spoke with Green upon his arrival. Green confirmed that he had called 911 and that his roommate was threatening to kill himself. He told the officers that Seibert was unarmed but that there was a large kitchen knife in the soil of a plant kept by the front door. Green directed Officer Bales and Sergeant Zeifman, who arrived just after Bales, to the apartment.
The officers knocked on the door of Seibert's apartment and announced themselves. No answer came at first, but the officers realized that there was someone in the apartment because they saw the peephole darken after they knocked. The officers told Seibert that they would get a key to the apartment if he did not open the door. The officers then told Seibert that they needed to make sure he was not hurt, at which point Seibert opened the door four or five inches, and told the officers that they could leave and that he was okay. He then shut the door. Officer Bales testified that he had been able to see only Seibert's torso and that the area in which they were standing was dark, so the officers were not convinced that Seibert was all right. Bales testified that merely seeing Seibert's torso was not good enough to comply with the standard operating procedures of the MBPD in attempted suicide calls. The officers knocked again, informing Seibert that they had to see all of him to ensure that he was not hurt before they could leave. Bales signaled to Sergeant Zeifman that if the door was opened again, Zeifman should place his baton in the opening so that Seibert could not close the door. Seibert eventually opened the door, and at that time the officers pushed their way into the apartment, having to force the door open because a couch was blocking the door.
The officers then had Seibert sit on the bed in the studio apartment, and Sergeant Zeifman remained to Seibert's right, in the kitchen area, while Bales stood four or five feet in front of him. The officers confirmed that Seibert was okay, and Bales glanced around the apartment, backing up a bit, to make sure no one else was in the apartment and that there were no objects around that indicated Seibert was attempting to commit suicide (e.g., pills, a rope, or knives). Bales asked Seibert whether there were other people in the apartment. As he asked this question, he looked to his right and was able to see through the slightly open bathroom door the severed foot of the victim on the edge of the bathtub. It was estimated that Bales was *468 about six feet from the bathroom when he was able to see the foot.
The trial court, following a hearing at which the above evidence was presented, denied the motion to suppress. The trial court reasoned that the officers were presented with exigent circumstances because of the report of an attempted suicide and in light of Seibert's suspicious behavior at the door when the officers arrived. The trial court then stated that the search was justified because, given the small size of the apartment, Officer Bales was merely looking around to ensure that there was no one else in the apartment  he was not conducting a search in the traditional sense of the word.
A warrantless search of a home is per se unreasonable and thus unconstitutional under the Fourth Amendment. Coolidge v. New Hampshire, 403 U.S. 443, 454-55, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). However, several exceptions to this rule have developed. One exception is the presence of an emergency situation which requires the police to assist or render aid. See Mincey v. Arizona, 437 U.S. 385, 392, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978) ("[T]he Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid."). Under this exception, police may enter a residence without a warrant if an objectively reasonable basis exists for the officer to believe that there is an immediate need for police assistance for the protection of life or substantial property interests. Rolling v. State, 695 So.2d 278, 293-94 (Fla.1997). It is immaterial whether an actual emergency existed in the residence; only the reasonableness of the officer's belief at the time of entry is considered on review. State v. Boyd, 615 So.2d 786, 789 (Fla. 2d DCA 1993). However, this search must be "strictly circumscribed by the exigencies which justify its initiation." Mincey, 437 U.S. at 393, 98 S.Ct. 2408 (quoting Terry v. Ohio, 392 U.S. 1, 26, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). Thus, an officer must cease a search once it is determined that no emergency exists. Rolling, 695 So.2d at 293.
We recently thoroughly considered the exigency exception and its application to a situation where a child was found wandering alone in an apartment complex. Riggs v. State, 918 So.2d 274, (Fla.2005). We concluded that the officers in that case were reasonable in their belief that the child's caretaker was in need of medical attention and were also reasonable in relying on strong circumstantial evidence in their decision to enter the defendant's apartment. In discussing previous decisions of this Court concerning the exigency exception, we confirmed that "authorities may enter a private dwelling based on a reasonable fear of a medical emergency." Id. at 281. We noted that "[i]n those limited circumstances, the sanctity of human life becomes more important than the sanctity of the home." Id.
Because a trial court's ruling on a motion to suppress is a mixed question of law and fact, we defer to the trial court on the factual issues but consider the constitutional issues de novo. Fitzpatrick v. State, 900 So.2d 495, 510 (Fla.2005). We must consider both whether the entry was permissible under these facts and whether the subsequent search of the apartment exceeded the parameters allowed if the entry was warranted. As stated above, the exigency exception to the warrant requirement generally permits the police to enter a home if there is an apparent emergency justifying their entry. Whether sufficient exigent circumstances exist is evaluated based on the totality of the circumstances. Zeigler v. State, 402 So.2d *469 365, 371 (Fla.1981). "The most urgent emergency situation excusing police compliance with the warrant requirement is, of course, the need to protect or preserve life." United States v. Holloway, 290 F.3d 1331, 1335 (11th Cir.2002). We have stated that "the `emergency exception' permits police to enter and investigate private premises to preserve life ... or render first aid, provided they do not enter with an accompanying intent either to arrest or search." Hornblower v. State, 351 So.2d 716, 718 (Fla.1977). Thus, we determined that exigent circumstances existed when an officer entered the defendant's home after he received a report that the defendant had not shown up for military duty and when the officer went to investigate, he found a broken window at the defendant's residence. Zakrzewski v. State, 866 So.2d 688, 695 (Fla.2003) (the officer testified that he "feared for the welfare of whomever may have been in the house at that time, thinking that there may have been a burglary, the family may have been on vacation, or something like that"). Exigent circumstances have been determined to exist when 911 calls were received, even in cases when the callers did not identify a life-threatening emergency, when the officers arrived at the source of the 911 call to find suspicious circumstances at the residence. See Campbell v. State, 477 So.2d 1068, 1070 (Fla. 2d DCA 1985) (after defendant's 911 call that she had overdosed on cocaine, police were permitted to enter even though she only requested paramedics and told the police to leave); State v. Barmeier, 878 So.2d 411, 413 (Fla. 3d DCA) (entry was permitted after 911 call from defendant about problems with his tenant, when responding officers found front door open and received no response when they called out to the residents, because the officers were concerned the people inside the residence might have been injured), review denied, 891 So.2d 549 (Fla.2004); In re J.B., 621 So.2d 489, 490 (Fla. 4th DCA 1993) (entry permitted after 911 call received from address though caller hung up; defendant, a juvenile, told officer to leave and that everything was okay, but officer observed place in disarray and so was concerned for defendant). It has also been determined that an emergency situation did not exist, however, when officers, after responding to a be-on-the-look-out (BOLO) call, entered an apartment because the officers observed that one of the individuals inside had a metal object in his hand, which the officers thought might be a weapon. See Alvarez v. State, 573 So.2d 400, 401 (Fla. 3d DCA 1991) (court reasoned that the BOLO did not mention a weapon and that suspect was cooperative with officers, so they had no reason to think that anyone was in danger); see also Hornblower, 351 So.2d at 718 (search not permitted because sounds of "scurrying" in residence that officers heard when they knocked did not create sufficient exigent circumstances to justify entry); Lee v. State, 856 So.2d 1133, 1137 (Fla. 1st DCA 2003) (officers' mere speculation that sting operation would get out of control and put lives of officers in danger was not sufficient exigent circumstance to justify entry).
In this instance, the police officers testified that they were operating under the impression that Seibert was suicidal. At no point did they have any reason to believe that a crime was occurring  their stated purpose in entering was to ensure that Seibert was not attempting to commit suicide. Zakrzewski, 866 So.2d at 695 (Court emphasized that officer did not enter defendant's "home with the intent to seize evidence or make an arrest" in concluding that entry was permissible). Green's 911 call about the possible suicide established the necessary exigent circumstance because the officers reasonably believed *470 that Seibert's life was in danger. Although it was eventually determined that there was no suicide attempt, it was objectively reasonable for the officers to believe that there was something wrong with Seibert. Moreover, the officers had a sufficient basis to corroborate Green's 911 call. Green was at the apartment building when the officers arrived and confirmed that he had placed the 911 call and that his roommate was suicidal.
Seibert argues that the police could have established that Seibert was all right by asking him to come out of the apartment or by giving him another chance to open the door all the way so that they could observe him and ensure that he was in fact all right. However, given Seibert's strange behavior in not answering the door for four or five minutes after the officers first knocked, after which he immediately slammed the door, we find no error in the trial court finding that the officers' entry was justified by the exigent circumstances. The officers could have reasonably thought that they would not get another opportunity to assist Seibert if they allowed him to slam the door again and that other means of entry (e.g., obtaining a key to the apartment) might take too long. The officers had no reason to doubt Green's statement that the defendant was suicidal.[6] Seibert's actions reasonably furthered the officers' suspicions that he was attempting suicide because he refused to open the door for several minutes, and when he opened it, he only allowed them to see his torso, which the officers indicated was insufficient to settle any doubts that they had about his safety. From the officers' perspective at the time of these events, walking away, allowing Seibert to stay in his apartment without ensuring that he was okay, or even spending any more time trying to gain entry could have been considered a dereliction of their duty to protect Seibert. State v. Hetzko, 283 So.2d 49, 52 (Fla. 4th DCA 1973) (officers had reasonable belief that resident was in trouble and would have been considered derelict in their duty had they not entered the apartment).
We next consider whether the subsequent search that led to the discovery of the victim's body was constitutional. "As to what may be done by the police or other public authorities once they are inside the premises, this must be assessed upon a case-by-case basis, taking into account the type of emergency which appeared to be present." 3 Wayne R. LaFave, Search and Seizure § 6.6(a), at 400 (3d ed.1996). The subsequent search following a warrantless entry must be "strictly circumscribed by the exigencies which justify its initiation." Mincey, 437 U.S. at 393, 98 S.Ct. 2408 (quoting Terry, 392 U.S. at 26, 88 S.Ct. 1868). Thus, as the Fifth District Court of Appeal stated, "if the police enter a home under exigent circumstances and, prior to making a determination that the exigency no longer exists, find contraband in plain view, they may lawfully seize the illegal items." Davis v. State, 834 So.2d 322, 327 (Fla. 5th DCA 2003). "However, if the police determine the exigency that initially allowed their entry into the residence no longer exists, any subsequent search is illegal and any contraband discovered pursuant to the illegal search is inadmissible." Id.
We affirm the finding of the trial court that this search was constitutional. Green testified that not much time passed between the officers' entry into the apartment until he heard Seibert running *471 away.[7] The officers' quick look around the apartment was not an extensive search because they did not open any containers or even enter any other rooms. There has been no evidence that any pretense existed on the part of the police in this case. It was objectively reasonable for them to glance around to ensure that the apartment and Seibert were secure. Moreover, insufficient time had elapsed for the officers to determine that the exigency had passed. Although the officers observed upon their entry that Seibert appeared unharmed, the officers had not had sufficient time to determine that he was not preparing to harm himself.
The instant situation is different from that in Mincey, where the search was found unwarranted because no emergency existed when the officers began their search and all persons in the apartment had been located. See 437 U.S. at 393, 98 S.Ct. 2408; see also Anderson v. State, 665 So.2d 281, 283 (Fla. 5th DCA 1995) (although particular search exceeded limits of exigency because officer went through documents in plastic bag in apartment, "[t]he officer was entitled to examine what was in plain view while on the premises"). In the present case, the officer's look from the main room of the studio apartment into the open bathroom was a limited extension of the initial entry, and since that entry was permissible, the subsequent actions of the officers were also lawful.

ISSUE 2. IMPROPER INTRODUCTION OF EVIDENCE
Seibert next argues that the trial court erred in denying his motion for a mistrial after the State attempted to introduce testimony concerning the time of intercourse, which Seibert claims was evidence of collateral criminal acts. During the testimony of Ms. McCue and Dr. Lew, the State asked whether these experts could determine if the victim was alive during intercourse. Both experts replied that the time of intercourse and its relation to the time of the victim's death could not be determined. Seibert made motions for mistrial after each witness's testimony, and the trial court denied the motions without discussion.
"In a criminal trial, it is generally improper to admit evidence tending to show that the accused committed crimes other than those of which he stands accused." Craig v. State, 510 So.2d 857, 863 (Fla.1987). Seibert argues that the introduction of this testimony was effectively the introduction of evidence that he committed sexual acts on a dead body, a crime for which he was not charged, and was therefore inadmissible because it was unduly prejudicial. The State asserts that the testimony was relevant to the issue of the timing of the murder in relation to the time of intercourse. Part of the defense's theory of innocence, as set out in the opening statement of the defense, was that Seibert had sexual relations with the victim, and then, while he was passed out, someone else killed the victim. The State argues that the testimony of these experts was relevant as a result of this theory of the case.
We do not find that the trial court erred in denying the new trial. "A ruling on a motion for mistrial is within the sound discretion of the trial court. See Power v. State, 605 So.2d 856, 861 (Fla. 1992). A motion for mistrial should be granted only when it is necessary to ensure *472 that the defendant receives a fair trial. Id." Cole v. State, 701 So.2d 845, 853 (Fla.1997). In Cole, we affirmed the trial court's denial of a motion for mistrial after a witness made a comment in her testimony indicating that the defendant had a prior criminal history. We stated that this remark "was not so prejudicial as to require reversal" and that the comment also did not require reversal because it "was isolated and inadvertent and was not focused upon." Id. Seibert has failed to show the necessary level of prejudice resulting from the challenged testimony at his trial that necessitated a mistrial. The challenged questions and responses were isolated. Neither of the experts gave an opinion as to when intercourse occurred; rather, both simply stated that they could not determine whether it happened before or after the victim's death. The evidence that Seibert murdered the victim was strong. As in Cole, we do not believe that the statement concerning the timing of intercourse prejudiced the guilt-phase proceedings.

ISSUE 3. IMPROPER BOLSTERING
In his next argument, Seibert asserts that the State improperly bolstered the testimony of Navarres' alibi witness and that the trial court erred in denying Seibert's motion for a mistrial on this basis. Seibert claims that the State's questioning at trial of MBPD Detective Jaccarino, who was co-lead investigator in this case, was a ground for mistrial because the questioning was an attempt to bolster the testimony of Navarres' alibi. However, the trial court sustained Seibert's objections to the questions, and the detective was never given an opportunity to answer the questions.
Q So, is it fair to say you have to use your skills as an investigator and your skills as a person to decide whether you are going to accept what they say, or whether you have to go further and investigate further what they have to say?
MR. HOULIHAN: Objection.
THE COURT: Sustained.
BY MS. SEFF:
Q When you did your investigation, an [sic] upon learning the information from the Korkours, and you talked to Ace Green, and you saw the crime scene, and all these other things, was there anything that leads you to believe that you should do more in terms of Danny Mavarres Korkour?
MR. HOULIHAN: Objection.
THE COURT: Sustained.
"[A]llowing one witness to offer a personal view on the credibility of a fellow witness is an invasion of the province of the jury to determine a witness's credibility." Knowles v. State, 632 So.2d 62, 65-66 (Fla.1993). Moreover, "[i]t is especially harmful for a police witness to give his opinion of a witnesses' credibility because of the great weight afforded an officer's testimony." Page v. State, 733 So.2d 1079, 1081 (Fla. 4th DCA 1999). While we recognize the problems caused by allowing the bolstering of witnesses at trial, we affirm the denial of the motion for mistrial because the trial court sustained the defense's objections to the questions. No actual bolstering occurred because the officer did not answer the questions, and thus the instant facts are distinguishable from those of the cases cited by Seibert. See, e.g., Lee v. State, 873 So.2d 582, 583 (Fla. 3d DCA 2004) ("The defense objected to the introduction of this testimony and moved to strike the testimony. The trial court overruled the objection."); Olsen v. State, 778 So.2d 422, 423 (Fla. 5th DCA 2001) ("Defense counsel objected and attempted to educate the prosecutor on this subject; however, the prosecutor was bent on pursuing this improper line of questioning. *473 The trial court erred by allowing the prosecutor and the officer to continue."); Page, 733 So.2d at 1081 ("Defense counsel objected and argued that this testimony improperly bolstered the credibility of Pyrzyk and moved to strike the last question and answer. The objection was overruled and the motion was denied.").

ISSUE 4. PROPORTIONALITY
Seibert next asserts that his death sentence was not proportionate. To determine whether death is a proportionate penalty, we consider the totality of the circumstances of the case and compare the case with other capital cases where a death sentence was imposed. Pearce v. State, 880 So.2d 561, 577 (Fla.2004).
Considering the totality of the circumstances surrounding this case, the aggravating and mitigating circumstances, and other similar cases, the death sentence imposed upon Seibert is proportionate. See, e.g., Boyd v. State, 910 So.2d 167, 193 (Fla.2005) (death sentence was proportionate where trial court found two aggravating factors, one statutory mitigator, and five nonstatutory mitigators); Johnston v. State, 863 So.2d 271, 286 (Fla.2003) (death sentence was proportionate for murder by manual asphyxiation where trial court found two aggravating factors, one statutory mitigator, and twenty-six nonstatutory mitigators, including a long history of mental illness), cert. denied, 541 U.S. 946, 124 S.Ct. 1676, 158 L.Ed.2d 372 (2004); Mansfield v. State, 758 So.2d 636, 647 (Fla.2000) (death sentence was proportionate for murder by manual asphyxiation where trial court found two aggravating factors, heinous, atrocious, and cruel (HAC) and murder committed during sexual battery, measured against five nonstatutory mitigating factors that were given little weight).

ISSUE 5. BAD CHARACTER EVIDENCE
Seibert next asserts that the trial court erred in denying his motion for mistrial on the basis of improper prosecutorial questions that were meant to introduce bad character evidence to the jury. During the penalty proceedings, in its cross-examination of Green, the State asked whether Seibert "would frequent or ... go to gay clubs to hustle money from gay guys." The defense objected to this line of questioning, and a sidebar conference was held. During that sidebar conference, defense counsel made a motion for mistrial. The trial court sustained the objection to the question, gave a curative instruction to the jury to disregard the question and response (though the record reveals that Green never responded to the question), and denied the motion for a mistrial. Seibert argues that this denial was an error because the State's question prejudiced the jury against him.
We deny Seibert's claim for a reversal of his sentence of death because the trial court did not abuse its discretion in denying the mistrial motion. A mistrial "should be granted only when it is necessary to ensure that the defendant receives a fair trial." Cole, 701 So.2d at 853. Seibert's objection to the question was sustained and the trial court gave a curative instruction to the jury on the matter. This question by the State did not prejudice the penalty-phase proceedings.
This case is therefore distinguishable from the circumstances of the other cases cited by Seibert where the Court reversed the sentences because the witnesses actually answered the challenged questions in those cases. See, e.g., Perry v. State, 801 So.2d 78, 91 (Fla.2001) (evidence introduced in State's case for penalty phase included testimony by wife of defendant about prior violent acts of defendant and *474 comments about his ability to kill someone with a knife); Bowles v. State, 716 So.2d 769, 773 (Fla.1998) (testimony about defendant's hatred of homosexuals was made a feature of sentencing phase); Geralds v. State, 601 So.2d 1157, 1163 (Fla.1992) (testimony of witness as to prior felonies of defendant admitted over defense objection). Because the isolated question in the instant case does not rise to the level of prejudice demonstrated in these other cases, we affirm the trial court's denial of the motion for mistrial.

ISSUE 6. RING CLAIM
The final issue Seibert raises is that Florida's capital sentencing scheme violates Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), because it permits the imposition of the death penalty without requiring that the jury unanimously find the existence of aggravating factors beyond a reasonable doubt and because a unanimous jury verdict is not required. Specifically, he asserts that his sentence was unconstitutional because there was no jury finding on the aggravating factors and because the vote for the death sentence was nine to three. As Seibert admits, the presence of a prior violent felony among the aggravating factors fulfills the mandate of Ring. Doorbal v. State, 837 So.2d 940, 963 (Fla.2003). Seibert pled guilty to attempted murder, kidnapping, and burglary charges in 1986. Because of the presence of the prior violent felony aggravator and because we continue to find that the necessary requirements of Ring have been met in such circumstances, see, e.g., Monlyn v. State, 894 So.2d 832, 839 (Fla.2004), we affirm the trial court's denial of Seibert's motion to declare Florida's sentencing statute unconstitutional.

SUFFICIENCY OF THE EVIDENCE
Although not raised by Seibert in his direct appeal, this Court independently reviews the evidence to determine whether sufficient evidence exists to support Seibert's first-degree murder conviction. Davis v. State, 859 So.2d 465, 480 (Fla.2003). Upon reviewing the record, we find that competent, substantial evidence exists to support the conviction. The victim's body was discovered in Seibert's apartment, and he was the only one shown by the evidence to have had control over the apartment from the time that the victim was last seen alive by others until her death. During the time period in which she was killed, Seibert repeatedly asked his roommate to not return to the apartment so that he could be alone with the victim. Blood that was found on the jeans worn by Seibert at the time of his arrest was consistent with the victim's DNA. No competent, substantial evidence was presented to dispute the evidence in support of Seibert's conviction.

CONCLUSION
Accordingly, we affirm Seibert's conviction of first-degree murder and sentence of death.
It is so ordered.
PARIENTE, C.J., and WELLS, LEWIS, QUINCE, CANTERO, and BELL, JJ., concur.
ANSTEAD, J., concurs as to the conviction and concurs in result only as to the sentence.
NOTES
[1] Hill testified that the female either screamed "help, please" or "help, [police]."
[2] The aggravating factors were that (1) Seibert was previously convicted of another felony involving the use or threat of violence (accorded great weight); and (2) the crime was especially heinous, atrocious, or cruel (accorded great weight).
[3] The nonstatutory mitigating factors were: (1) Seibert was a nonviolent prisoner and posed no threat of harm to prison staff (accorded moderate weight); (2) he had a dysfunctional family background and was adopted (accorded little weight); (3) Seibert had a history of psychological problems (accorded moderate weight); (4) he had a history of drug abuse (accorded little weight); (5) Seibert was a good friend (accorded minimal weight); and (6) his behavior in court was appropriate (accorded minimal weight).
[4] Seibert claims that (1) the trial court erred in denying his motion to suppress evidence discovered and statements made as a result of the nonconsensual, warrantless entry and search by the police of his apartment; (2) the trial court erred in denying his motion for a mistrial after the State improperly attempted to introduce evidence of his collateral criminal activity; (3) the trial court erred in denying his motion for mistrial after the State asked questions of a police detective that improperly bolstered the credibility of another suspect's alibi; (4) the death sentence is disproportionate; (5) the trial court erred in denying a mistrial following a prosecutorial comment concerning an irrelevant criminal activity; and (6) Florida's capital sentencing scheme violates Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).
[5] Green estimated that it took the officers more than twenty minutes to arrive. However, Officer Bales testified that he was only a couple of blocks away on another call and arrived shortly after receiving the dispatch.
[6] Although Green told the 911 dispatcher that he did not think Seibert would kill himself, there is no evidence that the dispatcher communicated this information to the responding officers.
[7] At trial, Green stated that he "immediately" heard Seibert start running after the door was opened.