946 So.2d 52 (2006)
Ralph Marvin NOLIN, Appellant,
v.
STATE of Florida, Appellee.
No. 2D05-5819.
District Court of Appeal of Florida, Second District.
December 20, 2006.
*53 James Marion Moorman, Public Defender, and Megan Olson, Assistant Public Defender, Bartow, for Appellant.
Charles J. Crist, Jr., Attorney General, Tallahassee, and Cerese Crawford Taylor, Assistant Attorney General, Tampa, for Appellee.
VILLANTI, Judge.
Ralph Marvin Nolin appeals his judgment and sentence for possession of cannabis with intent to sell, manufacture, or deliver. Mr. Nolin entered a no contest plea, reserving the right to appeal the trial court's denial of his dispositive motion to suppress the cannabis seized from a dresser in his home by police during a warrantless search. At the suppression hearing, the State failed to prove that the search was a "precautionary sweep" of the space immediately adjoining the place where Mr. Nolin was secured or that the officers had an articulable basis for a broader "protective sweep" as explained in Maryland v. Buie, 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990). Accordingly, we reverse *54 the denial of the motion to suppress and remand with instructions to discharge Mr. Nolin on this charge.
At the hearing on the motion to suppress, Largo Police Officer Rogers testified that he responded to the Nolins' house based on a domestic disturbance dispatch, issued in response to a neighbor's telephone call. When Officer Rogers got out of his police car, he heard the slamming sound of either exterior or interior doors coming from the area of the Nolins' house. He went through the Nolins' open side gate and entered their backyard. There, the officer did not see a person but did see a large amount of broken glassware littered on the concrete walk; the glassware appeared to have been broken that evening. From the backyard, Officer Rogers looked into a screened porch where "everything looked fine" and into the Nolins' kitchen, observing "that [a] microwave had been thrown on the floor."
A short time earlier, when two other officers, Kraft and Iskra, first arrived, they heard incoherent screaming, which they believed came from male and female voices; however, when they knocked and announced their presence, all sounds from within ceased. The officers found the "sounds" of this silence disturbing. Because these other officers had been unsuccessful in making contact with anyone inside the home, all three officers decided to enter the home and do a welfare check. They entered through an unlocked screen door to the porch where Officer Rogers used his "multipurpose tool" to unlock the back door. According to Officer Rogers, "When we opened the door there was a female that was in front of us and down the hall we saw a male exit what appeared to be one room at the end of the hall run towards the front, what would be the front door of the residence." A baseball bat was leaning on the wall next to the front door.
During cross-examination, Officer Rogers agreed that when he told the man, Mr. Nolin, to stop, he did so. Officer Rogers agreed that Mr. Nolin came back, sat on the couch, complied with the officers, and did not attempt to get the baseball bat. Finally, Officer Rogers agreed that he had no reason to expect there to be any firearms in the house.
Officer Kraft testified that she and her partner, Officer Iskra, were dispatched to a domestic disturbance at the Nolins' house. While they were talking to the complainant, she heard sounds of "yelling and screaming and crashing and thuds" coming from the Nolins' house. She and her partner then knocked and banged on the Nolins' front door. As soon as the officers announced themselves, the noise stopped. After they were unable to get any response from the home's occupants, the officers went into the backyard. Officer Kraft also observed the broken glass in the yard and the overturned microwave. Because she was still not able to get a response from the home's occupants, Officer Kraft became concerned that someone inside was injured, and the officers entered the home in the manner described by Officer Rogers. According to Officer Kraft, the officers made contact with Mrs. Nolin "[w]hen we walked into the homewhen we walked into the back lanai, we walkedthere was a door to the left. We walked in and there was a hallway and her bedroom, I do believe is right there, and she came out into the hallway when she heard that we were inside the home." Officer Kraft testified that Officers Rogers and Iskra encountered the male, Mr. Nolin.
Subsequently, Officer Iskra performed a nonconsensual protective sweep of the residence. Officer Kraft testified that a protective sweep is done any time law enforcement enters someone's home. She *55 explained, "We do a protective sweep to make sure that nobody is going to jump out of any closets at us, nobody is hiding behind the bed in a bedroom, just so we it's for our safety and for the other people's safety in the home as well." According to Officer Kraft, a protective sweep is based on the assumption that "[w]e always think that there is more than what we see in front of us inside of a home." Officer Kraft testified that Officer Iskra found the cannabis on a dresser during the protective sweep. Unfortunately, Officer Iskra did not testify at the suppression hearing. Thus, our record review is without the benefit of this key witness's particularized report of the home's configuration.
On cross-examination, Officer Kraft agreed that Mrs. Nolin was shocked to see the officers and appeared frazzled. Mrs. Nolin told Officer Kraft that she was happy that the officers were there. Mrs. Nolin did not appear to be in any physical distress. Officer Kraft's testimony regarding Mrs. Nolin's condition was consistent with Officer Rogers' testimony; he testified that Mrs. Nolin "looked okay."
Mrs. Nolin also testified at the suppression hearing. She testified that she had "a disease that makes me kind of weird. But [Mr. Nolin] had brought home some dishes that night and I get in weird moods and, you know, he was justhe brings home stuff all the time, which I usually like, and he brought home some dishes and I was just, you know. . . . I didn't want to wash the dishes. I didn't like the dishes." Mrs. Nolin explained that in apparent response to her displeasure, her husband then went into the backyard and smashed the dishes. While Mr. Nolin was smashing the dishes, Mrs. Nolin went into their den, watched television, and went into a Xanax-assisted sleep.[1] Mrs. Nolin testified that she "went in the other room and I gave him the silent treatment." Mrs. Nolin was awakened when an uninvited person, Officer Kraft, entered her room and searched it. Mrs. Nolin testified that she was scared and told the officer that her husband was also in the home. She denied hearing the officers knocking, and she did not give the officers permission to search her home. In response to questioning from the court, Mrs. Nolin explained that her husband had been yelling when he was breaking the dishes.
The trial court denied the motion to suppress the cannabis found on the dresser. The trial court, as was its prerogative, disbelieved Mrs. Nolin's testimony and determined that the officers had a reasonable basis to be concerned about the safety of the persons inside the home.
We begin our discussion by noting that we give deference to the trial court's factual findings but review its legal conclusions de novo. Riggs v. State, 918 So.2d 274 (Fla.2005). Here, we find no fault with the trial court's factual findings, but we find that these facts legally require suppression. "It is a `basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." Payton v. New York, 445 U.S. 573, 586, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). Because there was a compelling need to check on the welfare of the occupants, the officers' initial warrantless entry into the house was lawful. See Seibert v. State, 923 So.2d 460 (Fla.2006) (holding that police may enter a residence without a warrant if there is an objectively reasonable basis to believe that there is an immediate need for *56 police assistance for the protection of life or substantial property interests). Here, the trial court concluded that there was "ample justification for a limited protective sweep" because there had been a "long, loud and destructive disturbance at the residence"; no one from inside the residence responded to the officers; and the officers had no knowledge as to how many people were in the residence or as to the "potential threat that those excited, angry and destructive people might pose." In other words, the silence that followed the "destructive disturbance" planted a vision of violence within the officers' minds, and therefore, exigencies required warrantless entry to investigate. While this concern supported the initial entry and a limited sweep for officer safety, once the seed of concern planted by this silence was dispelled, there was no justification to conduct the more intrusive search that produced the cannabis. The law simply does not support the trial court's conclusion that the facts here were those depicting a "justifi[ed]" limited protective sweep. Rather, the undisputed facts demonstrate that the search that revealed the cannabis was clearly outside the parameters authorized by Buie.
In Buie, the Supreme Court recognized two types of permissible sweeps of a residence following the arrest of a subject in a home.[2] The first "precautionary sweep" may be performed without probable cause or reasonable suspicion and extends only to the immediately adjacent spaces to the place of the arrest, including closets, "from which an attack could be immediately launched." Buie, 494 U.S. at 334, 110 S.Ct. 1093. Notably, the second "protective sweep" requires "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." Id. In either instance, the Supreme Court emphasized that
such a protective sweep, aimed at protecting the arresting officers, if justified by the circumstances, is nevertheless not a full search of the premises, but may extend only to a cursory inspection of those spaces where a person may be found. The sweep lasts no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises.
Id. at 335-36, 110 S.Ct. 1093 (footnote omitted). There is no bright line test to determine when one type of permissible sweep ends and another begins. The totality of facts of each case drives this determination. Vanslyke v. State, 936 So.2d 1218 (Fla. 2d DCA 2006).
The logic in Buie is rooted in the analogous intrusion allowed in Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), where a nonconsensual pat down for weapons was permitted because it was "no more than necessary to protect the officer from harm." Buie, 494 U.S. at 333, 110 S.Ct. 1093. Otherwise, the Fourth Amendment's prohibition against unreasonable searches applies.
At the suppression hearing, the State failed to present evidence to support the more intrusive protective type sweep of the Nolins' home. There was no specific testimony regarding the size of the house, the furniture, the number or sizes of the rooms and closets, or any configurations; testimony even remotely regarding these concerns was confusing at best. There were also no specific factual findings on *57 these matters. For example, there was no evidence that Mr. Nolin's bedroom was adjacent to or near the living room where Mr. Nolin was secured and sitting on a couch. While the limited precautionary search of the immediate area around Mr. Nolin was permissible without "articulable facts," it is clear, even on this confusing record, that the contraband was not discovered in this area. Rather, it was discovered as part and parcel of the "full-blown" protective sweep.
Contraband discovered in plain view during a permissible protective sweep need not be suppressed; however, "[t]o support such a search, the police officer must articulate facts sufficient to warrant a reasonable belief that the [house] harbored dangerous individuals." Runge v. State, 701 So.2d 1182, 1185 (Fla. 2d DCA 1997) (finding that State did not justify warrantless search as a Buie sweep when police conducted search just to make sure no one else was in the apartment and without specific factual basis for believing dangerous individuals were in the apartment). Here, neither of the testifying officers identified any objective fact that led them to believe that anyone other than the Nolins, let alone an individual of dangerous propensity, was inside the home. The male and female voices heard upon arrival were consistent with the number of individuals found immediately upon entry. The neighbor did not identify, nor did the officers testify, that more than two people were inside the home. Clearly, the Nolins themselves posed no danger to the officers. However, even if this were not the case, "[t]he facts on which officers may justify a Buie protective sweep are those facts giving rise to a suspicion of danger from attack by a third party during the arrest, not the dangerousness of the arrested individual." United States v. Colbert, 76 F.3d 773, 777 (6th Cir.1996). Moreover, under the facts of this case, the silent response to the officers' arrival was a "lack of information [that] cannot justify the warrantless [protective] sweep in this case." Chaves, 169 F.3d at 692.
Thus, the trial court's finding that the officers did not know, even if technically true, how many people were actually inside the home is focused on the wrong inquiry. The relevant inquiry is whether articulable facts were proven to support the trial court's finding suggesting there were more than the two occupants secured. The answer is clearly no. Indeed, Officer Kraft testified in conclusory fashion that the sweep was done because such "is done anytime law enforcement enters somebody's home." Police policy to routinely perform a protective sweep in response to a domestic call simply does not pass constitutional muster. "However, sensible as that may seem, such a protective measure [as a routine procedure] is only allowable when the officers have some reasonable grounds to suspect additional persons may be present. It cannot be justified routinely." Newton v. State, 378 So.2d 297, 299 (Fla. 4th DCA 1979). "This is exactly the kind of `mere "inchoate and unparticularized suspicion or hunch"' that Buie indicates is insufficient to support a warrantless sweep." United States v. Chaves, 169 F.3d 687, 692 (11th Cir.1999) (quoting Buie, 494 U.S. at 332, 110 S.Ct. 1093 (quoting Terry, 392 U.S. at 27, 88 S.Ct. 1868)).
Once the compliant Nolins were safely accounted for and no articulable facts presented to support the existence of other individuals, firearms or other weapons, probable cause, or reasonable suspicion of a crime, the officers had no right to further search the residence. Therefore, the protective sweep exceeded the permitted scope established by Buie. Because the State failed to meet its burden to demonstrate articulable facts to justify the necessity *58 or extent of the warrantless protective sweep of Mr. Nolin's home, we cannot uphold the search on that basis.[3] No other exceptions to the warrant requirement apply in this case. Accordingly, when "considered in the context of the totality of relevant circumstances," suppression of the physical evidence seized is required. Vanslyke, 936 So.2d at 1222.
Reversed and remanded with directions to discharge Mr. Nolin on this charge.
NORTHCUTT and SALCINES, JJ., Concur.
NOTES
[1] Mrs. Nolin had a prescription for this medicationwhich she explained was for her anxiety and panic disorder.
[2] We point out that while Mr. Nolin was not arrested at the time of the protective sweep, his detention on the couch causes us to apply the same Buie-type analysis.
[3] As commented by Judge Altenbernd in Runge, we too note that "[w]e are not unmindful of the dangers police face daily while performing their duties. . . . Our paramount duty in cases such as this, however, is to determine whether the facts presented demonstrate that concern for officer safety justifies an exception to the Fourth Amendment right to be secure in one's home against unreasonable warrantless searches." Runge, 701 So.2d at 1186 (citation omitted).