NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING
MOTION AND, IF FILED, DETERMINED

IN THE DISTRICT COURT OF APPEAL

OF FLORIDA

SECOND DISTRICT

MICHAEL FRANK LAPACE,       )
)
     Appellant,        )
)
v.                   )     Case No. 2D17-1493
)
STATE OF FLORIDA,         )
)
     Appellee.        )
_____)

Opinion filed October 17, 2018.

Appeal from the Circuit Court for Sarasota
County; Deno Economou, Judge.

Howard L. Dimmig, II, Public Defender, and
Karen M. Kinney, Assistant Public Defender,
Bartow, for Appellant.

Pamela Jo Bondi, Attorney General,
Tallahassee; and David Campbell,
Assistant Attorney General, Tampa, for
Appellee.


CRENSHAW, Judge.

Michael Lapace appeals his convictions and sentences after pleading nolo

contendere to a number of drug related charges. Mr. Lapace entered his pleas after the

trial court denied his motion to suppress evidence obtained as a result of a warrantless

search of a residence, reserving the right to appeal the adverse ruling. We reverse the

trial court's denial of Mr. Lapace's motion to suppress because the evidence presented did not support the trial court's finding that the deputies reasonably believed that exigent circumstances existed that justified immediate entry into the residence without a warrant.

The testimony at the suppression hearing revealed that on September 4, 2016, two Manatee County Sheriff's deputies were responding to an unknown law enforcement problem call. The person who called 911 did not know her exact address and was giving the dispatcher landmarks around her location. At some point, the caller hung up but answered when the dispatcher called back and continued to try and relay the address, which was eventually determined by the cell phone satellite ping. No testimony was elicited at the hearing regarding who had called 911 or what crime or problem the caller had been reporting.

When the deputies arrived at the address provided by dispatch, they saw a woman parked in a car in an empty lot across from the address provided. The deputies approached the woman and asked if she knew why they had been dispatched to that location. The woman responded that she had no idea. As the deputies continued toward the house, and as the woman was pulling away to leave, she yelled out the window that her ex-boyfriend was inside the house and that he had a warrant out for his arrest and she stated his first name. At the hearing, the deputy testified that he could not remember what name she had given but remembered that it started with an "M" and thought it was either Michael or Matthew. The deputies did not know the name of this woman until after they had Mr. Lapace in custody.

- 2 -

The deputies proceeded to knock on the door of the house. Heather Lawson answered the deputies' knock but refused to open the door, stating that she had just been beaten up by an unknown woman. The deputies advised Ms. Lawson that the other woman was no longer there and that it was safe to come out. Ms. Lawson opened the door and appeared to be nervous and hesitant to speak to the deputies. She told them that a woman she did not know had knocked on her door and that they got into a physical altercation. Ms. Lawson had a cut on her foot and a red mark on her leg, where Ms. Lawson indicated that the unknown woman had bitten her.

The deputies asked Ms. Lawson if anyone else was inside the house. Ms. Lawson hesitated, looked back into the house, and stated, "No, and you can't come inside." The deputy testifying stated that he did not believe Ms. Lawson because the woman in the car had told them that there was a male inside and because Ms. Lawson seemed reluctant to answer any questions. At that point, the deputy testified that he believed there was a possible domestic dispute of some sort and believed that he needed to check on the welfare of anyone who may have been inside the house. The deputy acknowledged that based on the injuries observed on Ms. Lawson, any domestic battery would have been a first-degree misdemeanor.

Ms. Lawson was instructed to get her identification, and when she turned to go into the house, the deputies followed her inside. When Ms. Lawson realized they were trying to follow her inside, she again told them that they could not come in and continued to protest while the deputies proceeded to search the house.

Only one of the deputies testified at the hearing. The deputy testified that prior to knocking on the door, he did not hear any yelling or anything else coming from

inside the house. There were no trails of blood or anything that would lead one to believe that someone was injured inside. Ms. Lawson had explained that her injuries were the result of a physical altercation with another woman. Once they entered the house, the deputy did not hear anyone crying, did not observe any blood, and did not hear anyone asking for assistance.

The deputy found Mr. Lapace hiding behind the door to a bedroom. Mr. Lapace was not in distress, he did not appear to need any medical attention, and the deputy did not observe any injuries on Mr. Lapace. Upon finding Mr. Lapace, the deputy physically grabbed Mr. Lapace's arms, put him belly down onto the bed, and put him in handcuffs. While Mr. Lapace was belly down on the bed, the deputy took his ID from his back pocket, ran his identification through dispatch, and learned that Mr. Lapace had a felony warrant. After Mr. Lapace had been detained, the deputy saw a laundry basket next to the bed, and on top of the clothes was a pipe commonly used for smoking methamphetamine. The deputy also noticed an open dresser drawer approximately two feet from the bed with narcotics inside. The deputy then searched through a bag and found a plethora of other narcotics. The deputy seized the property and took Mr. Lapace outside.

Mr. Lapace moved to suppress the physical evidence obtained as a result of the search, contending that contrary to the State's position, exigent circumstances did not justify a warrantless entry into the residence. The trial court denied the motion to suppress, finding that the deputies were entitled to enter the house without a warrant under the emergency aid exception to the warrant requirement. The trial court noted that a 911 call is a cry to authorities for help and found that the deputies would have

been remiss in not entering the residence of an abandoned 911 call.  The trial court reasoned that after seeing Ms. Lawson come outside with injuries to her body and noting her nervousness and her hesitance to speak to law enforcement, a common reasonable assumption would be that there was someone in the house that either may have injured this woman or that there may be other injured people inside the home.

The trial court's conclusion that the deputies' entry into the residence was lawful was error.  In <u>Brigham City v. Stuart</u>, 547 U.S. 398 (2006), the Supreme Court set forth the principles of Fourth Amendment law:

> It is a " 'basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable.' "  Nevertheless, because the ultimate touchstone of the Fourth Amendment is "reasonableness," the warrant requirement is subject to certain exceptions. . . .   "[W]arrants are generally required to search a person's home or his person unless 'the exigencies of the situation' make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment."
>
> One exigency obviating the requirement of a warrant is the need to assist persons who are seriously injured or threatened with such injury.  " 'The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency.' "  Accordingly, law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury.

<u>Id.</u> at 403 (alteration in original) (citations omitted).

Whether a warrantless search is justified by such an emergency is determined by the totality of the circumstances.  See <u>Zeigler v. State</u>, 402 So. 2d 365, 371 (Fla. 1981).  The "police may enter a residence without a warrant if an objectively reasonable basis exists for the officer to believe that there is an immediate need for

police assistance for the protection of life or substantial property interests." Seibert v. State, 923 So. 2d 460, 468 (Fla. 2006) (citing Rolling v. State, 695 So. 2d 278, 293-94 (Fla. 1997)). "[T]he burden is on the government to demonstrate exigent circumstances that overcome the presumption of unreasonableness that attaches to all warrantless home entries." Welsh v. Wisconsin, 466 U.S. 740, 750 (1984). In addition, "an entry based on an exigency must be limited in scope to its purpose. Thus, an officer may not continue her search once she has determined that no exigency exists." Rolling, 695 So. 2d at 293.

The dispositive question in this case is whether the State met its burden of showing that the deputies reasonably believed that exigent circumstances existed that justified an immediate entry into the home without a warrant. See Dixon v. State, 36 So. 3d 920, 924 (Fla. 4th DCA 2010); see also Wheeler v. State, 956 So. 2d 517, 521 (Fla. 2d DCA 2007) ("Our analysis turns on whether the State was able to demonstrate that the deputies faced a grave emergency that made entry into Wheeler's home imperative."). If the State meets this burden, ordinarily the court must then determine whether the subsequent search of the house exceeded the parameters allowed if the entry was warranted. Seibert, 923 So. 2d at 468. However, neither of the parties here have raised any argument related to the scope of the search that was conducted after the deputies entered the house, and as such, any argument related to the scope of the search has been waived and will not be addressed by this court.

Here, the State contends that the deputies were justified in entering the residence because, under the totality of the circumstances, the deputies' suspicion of a medical emergency was based upon reasonable inferences drawn from the available

evidence.  However, the cases relied upon by the State are distinguishable from the facts of this case because in each of the cited cases, the officers' belief that there was an immediate need for their entry into the residence to address a medical emergency was based on more than just a suspicion of a "possible domestic dispute of some sort." See, e.g., Michigan v. Fisher, 558 U.S. 45, 45-56 (2009) (holding that exigent circumstances existed when officers responded to a disturbance complaint; observed a pickup truck with its front smashed, damaged fence posts, broken house windows with glass still on the ground, blood on the hood of the pickup and on clothes inside the pickup, and blood on one of the doors to the house; and could see the defendant inside the home, with a cut on his hand, screaming and throwing things, and arming himself with a gun); State v. Shillingford, 136 So. 3d 1242, 1244 (Fla. 5th DCA 2014) (holding that exigent circumstances existed when officers were summoned to investigate a domestic battery and observed a blood trail leading to the defendant's apartment and heard moaning coming from within the apartment); C.L.L. v. State, 115 So. 3d 1114, 1116 (Fla. 1st DCA 2013) (holding that exigent circumstances existed when officers responded to a 911 hang-up where a disturbance could be heard in the background and upon arrival observed a man with blood on his hands but no injury and admitted to being in a fight but claimed that the other participants had left); United Sates v. Barone, 330 F.2d 543, 544 (2d Cir. 1964) (holding that exigent circumstances existed where officers heard screams coming from apartment).

In the instant case, the State does not argue that the deputies encountered any screaming, suspicious sounds, blood, or other readily apparent disturbance when they arrived at the residence.  The State argues that based on the

totality of the circumstances, the deputies could reasonably believe that there was an ongoing domestic dispute based on the 911 call, the information from the unidentified woman, and Ms. Lawson's suspicious behavior and injuries.  We consider each of these circumstances in turn.

The 911 call

The deputies were dispatched to the residence in response to an unknown law enforcement problem call.  When they arrived, the deputies were armed only with the information that a person had called 911, was unable to give her exact address, and was providing landmarks to assist in locating the residence.

"Exigent circumstances have been determined to exist when 911 calls were received, even in cases when the callers did not identify a life-threatening emergency, when the officers arrived at the source of the 911 call to find suspicious circumstances at the residence." Seibert, 923 So. 2d at 469.  The focus of the inquiry is on the reasonableness of the officers' belief that an emergency existed at the time of entry.  Id. at 468.

In In re J.B., 621 So. 2d 489, 489 (Fla. 4th DCA 1993), the officers were responding to a home that was the source of a 911 call where the caller hung up without speaking or requesting assistance.  In finding that the officers acted lawfully in trying to enter the home, the court analogized a 911 call to screams for help.  Id. at 490.  The court also discussed the fact that the 911 system is used to report crimes and injuries requiring immediate assistance and that a disconnect could happen for a myriad of reasons and did not mean the emergency was over.  Id. at 490-91.  Given that "[a] 911 call is a cry to the authorities for help" and that the officers observed a window with a

broken screen and trash all over the front room, taken together with the defendant's unusual behavior, the court in J.B. concluded that the investigating officer had a duty to investigate until he was satisfied that no emergency existed. Id. at 491.

Similarly, in Dixon, the court held that the officers had a duty to investigate a 911 call; however, in order to justify a warrantless entry and search of the apartment, the State was required to prove that exigent circumstances existed that required entry into the apartment immediately without a warrant. Dixon, 36 So. 3d at 924. When the officers first arrived at the apartment, before they entered, the defendant and his girlfriend informed them that the robbers had already left the apartment. Id. The testifying officer did not observe evidence of an ongoing burglary, which may have required immediate entry without a warrant. Id. Furthermore, the officer did not testify that he was concerned that there could be victims inside the apartment who needed immediate assistance. Id. Based on those facts, the court held that the observations by the officer did not support the warrantless entry into the apartment. Id.

Here, the deputies certainly had a duty to investigate the 911 call until they were reasonably satisfied that no emergency existed or that a once-urgent situation was no longer urgent. However, the deputies were not entitled to enter the home once they determined that any emergency had dissipated. In the instant case, Ms. Lawson came to the door and gave a plausible explanation for the injuries on her foot and leg, which the deputies were able to corroborate because they saw a woman drive away from the house upon their arrival. The deputies did not hear anything within the residence that would lead them to reasonably conclude that someone in the residence was in distress. They did not observe any evidence of an ongoing domestic dispute, which might have

required immediate entry without a warrant.  Accordingly, any exigency that may have existed and prompted the 911 call had dissipated by the time the deputies arrived and received the initial explanation from Ms. Lawson that she was battered by an unknown woman, whom the detectives had seen fleeing the scene.

The information from the unidentified woman in the car

After they arrived, the deputies saw an unidentified woman parked in a car across from the residence.  When they approached the woman, she stated that she did not know why they were called, but as the deputies began approaching the residence and the woman was driving away, the unidentified woman rolled her window down and shouted to the deputies that her ex-boyfriend was in the house and there was a warrant out for his arrest.  The deputy testified that she also stated her ex-boyfriend's name but that he could not recall whether she said Michael or Matthew.  He thought the name started with an "M."

An anonymous tip may provide the basis for conducting a warrantless entry to render emergency assistance or to protect someone from imminent injury.  But for an anonymous tip to justify a warrantless entry, the tip—considered in the context of the totality of relevant circumstances—must provide an "objectively reasonable basis" for the officer "to believe that there is an immediate need for police assistance." Seibert, 923 So. 2d at 468.

Anonymous tips, which are more susceptible to abuse than a tip by a known informant, may be less reliable than other investigative leads.  See Florida v. J.L., 529 U.S. 266, 270 (2000).  The government's interest in conducting a search based upon an anonymous tip, therefore, is usually measured by examining the tip's

"indicia of reliability." Id. Generally, a search based upon an anonymous tip withstands scrutiny under the Fourth Amendment only if the tip contains sufficient details and information that can be independently corroborated by the police to establish a level of reliability regarding the information in the tip. Id. at 270-71.

Here, the woman did not give her name, did not give her ex-boyfriend's full name, did not give a physical description of her ex-boyfriend, and gave no information regarding the type of warrant allegedly outstanding. The record is devoid of any details that would provide support for the conclusion that the anonymous tip was reliable. The tip provided no basis for concluding either that anyone in the house had suffered any injury or that anyone in the house was at risk of imminent injury. The vague statements concerning an "ex-boyfriend" and a possible warrant are insufficient to establish that it was necessary for the deputies to enter the house "to protect an occupant from imminent injury." See Vanslyke v. State, 936 So. 2d 1218, 1224 (Fla. 2d DCA 2006) (quoting Brigham City, 547 U.S. at 402) (holding that even a reliable report that children were living in a house with drugs and guns would not show the existence of an exigency justifying a warrantless search without an additional showing of a specific threat of imminent harm to the children in the house). That the tip proved accurate and that the officers acted with good intentions does not alter the legal conclusion that the search was improper. See J.L., 529 U.S. at 271 ("The reasonableness of official suspicion must be measured by what the officers knew before they conducted their search.").

Ms. Lawson's behavior

In denying the motion to suppress, the trial court considered Ms. Lawson's "demeanor, her behavior, her conduct" in finding that the deputies had an objectively

- 11 -

reasonable basis for believing that there was an emergency that required immediate police attention.

Allowing police to use a resident's reaction to law enforcement's presence at their home and the resident's contemporaneous clear expression of unwillingness to engage with the officers "as the only extra information necessary to confirm whatever suspicion brought [the officers] to the door in the first place . . . would . . . unjustifiably erode 'the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion'—which stands '[a]t the very core' of our Fourth Amendment protections." Calloway v. State, 118 So. 3d 277, 280 (Fla. 5th DCA 2013) (second alteration in original) (quoting Kyllo v. United States, 533 U.S. 27, 31 (2001)). Here, Ms. Lawson's reaction to the deputies' presence at her home, together with her unwillingness to allow the deputies into the house, cannot satisfy the requisite showing of an objective belief that there was an ongoing emergency that required the immediate attention of the police. Even when Ms. Lawson's behavior is combined with the information from the anonymous tip—that there was a man in the house, who had an outstanding warrant—and the unknown law enforcement problem call, it was not objectively reasonable for the deputies to believe that there was an ongoing or imminent emergency that required their immediate attention.

There was no objective basis for the deputies to fear for anyone's safety. The deputies responded to the residence and came upon a quiet scene. The deputies observed no noise that would indicate a disturbance, no screaming, no blood, nor anything else that would indicate that there was a domestic disturbance taking place. The only information the deputies had prior to entering the house was that they were

- 12 -

responding to an unknown law enforcement problem call based upon a 911 call from a person who did not know her exact address, that there may have been a man inside the house who had a warrant out for his arrest, that Ms. Lawson had a cut on her foot and a bite mark on her leg that she claimed was the result of an altercation with an unknown woman, that an unknown woman had just driven away from the house, and that, based on a hunch, there may have been a "possible domestic dispute of some sort." This was not enough to form an objectively reasonable basis to believe that there was an immediate need for police assistance for the protection of life.

We conclude that the deputies lacked an objectively reasonable belief that there was an ongoing or imminent emergency that required immediate police attention. The entry into the house and subsequent search without a warrant were in violation of the Fourth Amendment. All physical evidence derived from the initial unlawful search should have been suppressed. Accordingly, we reverse Mr. Lapace's convictions and sentences in case number 2016-CF-3094 and remand for further proceedings consistent with this opinion.

Reversed and remanded.


BLACK and SLEET, JJ., Concur.

- 13 -