701 So.2d 845 (1997)
Loran COLE, Appellant,
v.
STATE of Florida, Appellee.
No. 87337.
Supreme Court of Florida.
September 18, 1997.
Rehearing Denied October 29, 1997.
*848 James B. Gibson, Public Defender and Christopher S. Quarles, Assistant Public Defender, Seventh Judicial Circuit, Daytona Beach, for Appellant.
Robert A. Butterworth, Attorney General and Judy Taylor Rush, Assistant Attorney General, Daytona Beach, for Appellee.
PER CURIAM.
We have on appeal the judgment and sentence of the trial court imposing a death sentence upon Loran Cole. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. For the reasons expressed below, we affirm Cole's convictions and death sentence but remand to the trial court for imposition of appropriate sentences for the remaining convictions for which Cole was adjudicated guilty.
On February 18, 1994, Pam Edwards, a senior at Eckerd College in St. Petersburg, Florida, drove to the Ocala National Forest, where she met her brother, John Edwards, a freshman at Florida State University in Tallahassee, Florida. The two planned on camping in the forest for the weekend and eventually decided to camp in Hopkins Prairie. They were setting up camp when Loran Cole briefly stopped by their campsite. Cole soon returned to the campsite, introduced himself as "Kevin," and helped them set up camp. After John and Pam ate dinner, Cole and William Paul came to the Edwards' campsite. Paul was carrying a walking stick and was introduced to the Edwards as Cole's brother. The four sat around the campfire, and at about 10:45 p.m., they decided to walk to a pond.
The four walked for a while but never found the pond. Instead, Cole jumped on Pam and knocked her to the ground. She got up and tried to run; however, Cole caught her, hit her on the back of the head, handcuffed her, and threw her down on the ground. Meanwhile, John had taken Paul's walking stick and was hitting him with it. Cole then helped Paul subdue John and moved John on the ground next to Pam. While they lay close to each other on the ground, John apologized to Pam for having exposed them to the dangers of these two strangers. Cole told the Edwards that he wanted to take their cars, and he went through their pockets and took their personal property, including their jewelry.
Paul took Pam up the trail, and he was complaining about his hand and head, which were injured in the altercation with John. Pam could hear Cole asking John why he *849 hurt Cole's brother and could hear John grunt a few times. Cole then came to where Pam and Paul were sitting and told them that they were going to wait until John passed out. Cole called back to John several times, and John responded by moaning. Eventually, Cole told Pam he was going to move John off the trail and tie him up. Pam then heard something that resembled a gagging sound. When Cole returned, he said that John must be having trouble with his dinner, hinting that John was vomiting. John died that night from a slashed throat and three blows to the head, which fractured his skull. The injury to the throat caused a loss of blood externally and internally into John's lungs.
Pam, Paul, and Cole then started walking back to Cole's campsite. On the way, they walked past John, and he was not moving. At the campsite, Cole forced Pam to sleep naked by threatening her that unless she cooperated, she and John would be killed. Cole then forced her to have sexual intercourse with him.
The next morning, Cole went to check on John and told Pam that John was fine. Cole left the campsite to purchase marijuana. When he returned, the three smoked marijuana, and Cole again forced Pam to have intercourse with him. After eating dinner, they packed up as much of the camp as would fit into the backpacks carried by Cole and Paul. Cole then gagged Pam and tied her to two trees. Cole and Paul left in Pam's car and went to a friend's trailer, where they spent the night. The two left several items of John Edwards' personal property at the trailer. Thereafter, Cole and Paul returned Pam's car to the Ocala National Forest and took John's car, a Geo Metro.
By the early morning on Sunday, Pam was able to free herself of the ropes. She did not move because she was afraid that if Cole and Paul returned and she was not there, they would hurt John. She stayed in that spot until daylight and tried to find John. When she was unable to find him, she flagged down a motorist, who took her to call the police. The police returned with Pam to the scene, and the police located John's body. The body was face down and was covered with pine needles, sand, debris, and small, freshly cut palm fronds. Both of his hands were in an upward fetal position; there was a shoestring ligature around his left wrist and a shoestring partially wrapped around his right wrist.
Police thereafter arrested Paul and Cole in Ocala on Monday, February 21, 1994. Paul and Cole were indicted on charges of first degree murder, two counts of kidnapping with a weapon, and two counts of robbery with a weapon. Cole was also indicted on two counts of sexual battery. Paul pleaded nolo contendere to the charges and was sentenced to life in prison without possibility of parole for twenty-five years on the murder charge and concurrent terms on the remaining charges. After a jury trial, Cole was found guilty on all counts of the indictment. A penalty-phase hearing was held, after which the jury unanimously recommended death. Finding four aggravators,[1] no statutory mitigators, and two nonstatutory mitigators,[2] the trial court followed the jury's recommendation and sentenced Cole to death.
On appeal, Cole raises fourteen issues.[3] In his first issue, Cole claims that the *850 trial court abused its discretion in allowing a portion of Pam Edwards' testimony to be read back to the jury during the jury's deliberations in the penalty phase. The jury requested to hear her testimony regarding John having difficulty with dinner. Defense counsel objected, requesting that the jury either be instructed to rely on its own recollection or be read the direct, cross, and redirect testimony of Pam regarding the whole scenario of the trail incident. The trial court determined that the court reporter could read that portion of the testimony over defense counsel's objection. Before the testimony was read, the jury clarified its request, asking for Pam's testimony beginning with John's apology to Pam. This portion of the testimony was then read to the jury.
Under Florida Rule of Criminal Procedure 3.410, upon request of the jury, a trial court has the discretion to order testimony be read to them. See Haliburton v. State, 561 So.2d 248, 250 (Fla.1990). We have found no abuse of discretion when a trial court rereads testimony specifically requested by the jury and that testimony is not misleading and does not place undue emphasis on any particular statements. Garcia v. State, 644 So.2d 59, 62 (Fla.1994); Haliburton. We have reviewed the record in this case and find no abuse of discretion by the trial court in allowing the rereading of portions of the testimony. The portions reread to the jury were directly responsive to the jury's request, and the limited rereading was not misleading and did not place undue emphasis on portions prejudicial to Cole. Accordingly, we find this issue meritless.
In issue two, Cole contends that the trial court erred in conducting several portions of the trial in Cole's absence. First, we reject Cole's claim regarding his absence from a hearing on the motion to sever. The record reflects that the trial court delayed hearing arguments on the motion until Cole was present. The trial court ultimately granted the motion at a status conference at which Cole was present. Thus, we find this issue without merit.[4]
Cole also contends that the trial court erred in holding numerous bench conferences in the hallway outside the courtroom without Cole's presence. However, the record reflects that at the beginning of the trial, defense counsel noted that the acoustics were poor in the small courtroom and sound carried. He then asked that side-bar conferences be held either in the hallway or the jury room. Defense counsel agreed with the trial court that the conferences should be held in the hallway. We have stated that a defendant does not have a constitutional right to be present at bench conferences involving purely legal matters. Coney v. State, 653 So.2d 1009, 1013 (Fla.), cert. denied,___ U.S. ___, 116 S.Ct. 315, 133 L.Ed.2d 218 (1995); Hardwick v. Dugger, 648 So.2d 100 (Fla.1994). Upon our review of the claimed errors, the record shows that these conferences involved purely legal issues for which Cole's presence would not have aided counsel. This claim is also procedurally barred because Cole did not make a contemporaneous objection to any bench conferences being held in the hallway or to his desire to participate in any of the conferences. See generally Hardwick at 105.
In issue three, Cole claims the trial court erred in allowing the introduction of victim-impact evidence. At the outset, we reject Cole's request that we should recede *851 from our holding in Windom v. State, 656 So.2d 432, 438 (Fla.), cert. denied, ___ U.S. ___, 116 S.Ct. 571, 133 L.Ed.2d 495 (1995), in which we found that victim-impact evidence was admissible pursuant to section 921.141(7), Florida Statutes (1993), once there is present in the record evidence of one or more aggravating circumstances described in section 921.141(5), Florida Statutes (1993). Cole also claims that the evidence introduced in this case exceeds the proper boundaries of section 921.141(7). During the penalty phase, the State presented the testimony of Brock Fallon, one of John Edwards' high school teachers. Fallon testified that John was a good student who was respected for his scholastic abilities as well as his personality. Based upon our review of the record concerning Fallon's testimony, we find that this testimony was limited to that which was relevant under section 921.141(7), and therefore we find no reversible error.
Next, in issue four, Cole claims error with respect to consideration of various aggravators and mitigators. In support of this claim, Cole raises several issues. First, Cole claims that the trial court erred in instructing and finding the aggravating circumstance that the murder was especially heinous, atrocious, or cruel. See § 921.141(5)(h), Fla. Stat. (1993). Regarding this aggravator, the trial court found:
In determining whether to apply the heinous, atrocious and cruel aggravator, a murder may fit this description if it exhibits a desire to inflict a high degree of pain, or an utter indifference to or enjoyment of the suffering of another. Kearse v. State, [662 So.2d 677] 20 Fla. L. Weekly S300 (Fla. June 22, 1995). When evaluating the evidence, the trial court may consider the victim's fear and emotional strain as contributing to the heinous nature of the murder. Preston [v. State], 607 So.2d at 409-10; Hannon v. State, 638 So.2d 39 (Fla. 1994).
After John Edwards was forcibly subdued and restrained, the Defendant left him on the ground next to his sister Pamela. John's concern and understanding of the developing events was evidenced by his statement of regret for getting them into the situation. Although faced with personal danger and physical harm, John's only comment was "I'm sorry, Pam."
After robbing the victims, the Defendant moved Pamela further down the trail and away from John. The Defendant returned to where John was laying and beat him severely in the head while repeating over and over, "Why did you hurt my brother?" (referring to the Co-Defendant although they are actually unrelated) Pamela testified that she could hear her brother's grunts and moans. The Defendant left John Edwards and re-joined Pamela and the Co-Defendant, stating they would wait until John passed out before moving down the trail. Eventually, when John quit moaning, the Defendant returned to [the] area where John lay to "move and tie him off the trail."
From the evidence and testimony presented, John was still alive at this time. The Medical Examiner, Dr. Janet Pillow, testified that the Defendant's death was caused by blunt trauma wounds to the head and by a throat cut through the thyroid cartilage (Adam's apple) and epiglottis. John sustained at least three severe blows to the head caused by a blunt instrument with a sharp edge. Based on the bruising and bleeding, the [doctor] concluded that John was alive when the blows were inflicted.
The throat wound consisted of one small laceration above the large cut. The Medical Examiner testified that the small cut indicates that John was alive and consciously reacted to the knife or jerked causing a small laceration above the main cut. When his throat was cut, John bled both externally and internally. The wound bled directly into his airway preventing him from breathing. Dr. Pillow testified that John lived for several minutes while suffering from air hunger or the inability to breath[e]. Pamela Edwards testified that while the Defendant was with her brother, she heard gagging sounds. When the Defendant returned from moving John, he commented on the gagging by stating John was having "trouble with his dinner," insinuating that he might be vomiting. *852 During the course of the night while they wandered in the woods, the Defendant, Co-Defendant and Pamela passed John several times. Pamela testified that John lay on his stomach with his feet tied behind him. He did not move or speak.
By the testimony and evidence, the State has proved beyond a reasonable [doubt] that the Defendant subjected John Edwards to a slow, tortu[r]ous death. John was conscious for several minutes while he gasped [for] air from a severed windpipe slow[ly] filling with blood. Death finally resulted from the head wounds and loss of blood from the severed throat. The beatings and the manner in which the Defendant killed John Edwards evidences a total indifference on the part of the Defendant to the victim's suffering. The Defendant knew the victim died a slow, choking death and reacted with a joke. The Court finds that the testimony and evidence establishes that the Defendant committed the murder of John Edwards in a manner that was especially heinous, atrocious or cruel.
We affirm the trial court's finding that this aggravator was established beyond a reasonable doubt in this murder.
Cole next challenges the weight which the trial court assigned to the prior-violent-felony aggravator because it was based upon Cole's contemporaneous convictions for violent felonies upon Pamela Edwards. This aggravator was established beyond a reasonable doubt. See Windom. We find Cole's reliance upon Terry v. State, 668 So.2d 954 (Fla.1996), to be misplaced. This Court in Terry found that it was relevant, when considering the entire circumstances of the case for purposes of proportionality review, that the prior-violent-felony aggravator was predicated upon a contemporaneous conviction as a principal to an aggravated assault committed by a codefendant. Id. at 965-66. Terry is thus distinguishable from the instant case because the aggravating circumstance here is predicated upon Cole's own actions in forcibly subduing Pam, handcuffing her, robbing her of personal property including her jewelry, money and car keys, and raping her twice.
Cole also challenges the trial court's findings regarding the following aggravating circumstances: (1) murder committed during the course of a kidnapping; and (2) murder committed for pecuniary gain. We find that each aggravating circumstance was established beyond a reasonable doubt in view of the jury's verdict in the guilt phase that Cole was guilty of the kidnapping and robbery of John Edwards, verdicts which Cole does not challenge on appeal. See Fotopoulos v. State, 608 So.2d 784, 793 (Fla.1992); Perry v. State, 522 So.2d 817, 820 (Fla.1988) (contemporaneous conviction for armed robbery unquestionably warranted finding that murder was committed during course of robbery). The record contains competent, substantial evidence to support the trial court's findings regarding these aggravators, and we find no error in the trial court's ruling that each aggravator be considered separately. See Preston v. State, 607 So.2d 404 (Fla. 1992).
In the last part of this claim, Cole contends that the trial court erred in its consideration of the mitigating evidence. The trial court classified the nonstatutory mitigation into three categories: (1) disparate treatment of the codefendant; (2) mental incapacity; and (3) deprived childhood. With respect to the disparate treatment, we agree with the trial court's conclusion that since Cole was the dominant actor and the one who committed the actual murder, the codefendant's life sentence was not a mitigating factor. See Hayes v. State, 581 So.2d 121, 127 (Fla.1991) (disparate treatment of codefendant is justified when defendant is more culpable participant in crime).
In the challenges to the other two categories of nonstatutory mitigation, Cole argues that the trial court erred in its weighing of this evidence. Deciding the weight to be given a mitigating circumstance is within the trial court's discretion, and a trial court's decision is subject to the abuse-of-discretion standard. See Blanco v. State, No. 85,118, ___ So.2d ___ (Fla. Sept. 18, 1997). In the sentencing order, the trial court detailed the evidence presented regarding each circumstance proposed, found each *853 of these nonstatutory mitigators to exist, and afforded them the weight which the court found was appropriate. Consequently, we find Cole's reliance on Nibert v. State, 574 So.2d 1059 (Fla.1990), to be misplaced. Unlike the instant case, in Nibert, the trial court failed to find and weigh nonstatutory mitigation, which was reasonably proven, that the defendant suffered from an abused childhood.[5] We thus find no error.[6]
Cole frames his issue four as a proportionality issue. After considering and rejecting his contentions in respect to aggravating and mitigating circumstances, we have performed our own proportionality review based upon the entire record. We conclude under that proportionality review that imposition of the death penalty is warranted.
In his next issue, Cole contends the trial court erred in denying a motion for mistrial. During its case-in-chief, the State called Mary Gamble, who lived in the trailer which Cole and Paul went to after leaving Pam in the forest on Saturday night. Prior to giving her testimony, Gamble was instructed by the trial court not to mention Cole's prior criminal record. On direct examination, the State asked Gamble about the circumstances surrounding her seeing several pieces of paper with John Edwards' name on them. In response to a question about how she came to see a receipt for a sleeping bag with John's name on it, Gamble stated, "I was nosey and knew some history on K.C., so I decided to go outside and look at the tag on the car." Defense counsel objected and argued that by using "history," Gamble was clearly referring to his prior criminal history. Counsel then requested a mistrial. The State responded that the reference would not have that connotation to the ordinary person and that this response was not intentionally elicited. The trial court denied the motion for mistrial but agreed to give a curative instruction. Defense counsel denied the offer, stating that he did not want to heighten the error. We do not agree with Cole's contention that the denial of the motion for mistrial on these facts was reversible error.
A ruling on a motion for mistrial is within the sound discretion of the trial court. See Power v. State, 605 So.2d 856, 861 (Fla.1992). A motion for mistrial should be granted only when it is necessary to ensure that the defendant receives a fair trial. Id. Based upon our review of the record, we agree that the reference was isolated and inadvertent and was not focused upon. See Merck v. State, 664 So.2d 939, 941 (Fla.1995). Since this remark was not so prejudicial as to require reversal, we hold that the trial court did not abuse its discretion. See generally Ferguson v. State, 417 So.2d 639, 642 (Fla. 1982).
In issue six, Cole argues that the trial court erred in denying his motion for change of venue. Cole filed this motion before the trial began, arguing that the pretrial publicity was so pervasive that Cole could not receive a fair trial. The trial court deferred ruling on the motion until after voir dire. The parties then agreed upon a procedure through which the court would first read the venire the indictment and ask general questions. Thereafter, the venire would be placed in the jury room, and each juror would be brought into the courtroom individually to be questioned about his or her exposure to publicity about the case. The jurors who were not struck for cause were brought in collectively and asked further questions by the attorneys. After the jury was selected, the trial court denied Cole's renewed motion for change of venue.
The test for determining whether to grant a motion for change of venue is
whether the general state of mind of the inhabitants of a community is so infected by knowledge of the incident and accompanying prejudice, bias, and preconceived opinions that jurors could not possibly put these matters out of their minds and try the case solely upon the evidence presented in the courtroom. *854 Manning v. State, 378 So.2d 274, 276 (Fla. 1979). A motion for change of venue is addressed to the trial court's discretion and will not be overturned on appeal absent a palpable abuse of discretion. See Davis v. State, 461 So.2d 67, 69 (Fla.1984). We find no such abuse of discretion in this case. Rolling v. State, 695 So.2d 278 (Fla.1997). The record shows that throughout the voir dire, the trial court readily excused jurors who stated that they had formed an opinion as to the defendant's guilt or would not be able to base a decision solely on the evidence presented at trial. The record demonstrates that the members of Cole's venire did not possess such prejudice or extensive knowledge of the case as to require a change of venue. Moreover, the record shows that Cole was not prejudiced from striking any undesirable juror or by any knowledge the jurors may have possessed. Accordingly, we find this claim without merit.
Turning to issue seven, Cole challenges the trial court's decision to allow the introduction of several photographs. At trial, Cole contended that several photographs introduced through the testimony of a police officer[7] and the medical examiner[8] were duplicative and unduly prejudicial. Prior to their introduction, the State proffered these photographs for the trial court's viewing. The trial court determined that each of the photographs was relevant and not duplicative. A trial court's decision on the introduction of photographic evidence will not be overturned on appeal unless there is a clear showing of an abuse of discretion. Pangburn v. State, 661 So.2d 1182, 1187-88 (Fla. 1995). We approve the procedures which the trial court followed in determining the admissibility of the photographs. Based on our review of the record concerning this issue, we find no abuse of discretion.
In his next issue, Cole argues that the trial court erred in denying his motion to suppress evidence seized following his warrantless arrest. At the hearing on the motion to suppress, Detective Sowder testified that he met with Pam Edwards on Sunday February 20, 1994. She described the entire criminal episode and provided Sowder with a detailed description of the perpetrators. She described Cole as being about thirty-six years old, five feet six inches tall, and approximately 200 pounds. He had strawberry blonde hair, thin on top and curly around the collar, and he wore a beard. He was wearing a utility cap, a black and blue flannel shirt, a black T-shirt with gold writing, black jeans, and a belt with the initials "K.C." on it. He also had several tattoos on his right forearm. Pam told police that he had a knife and a scabbard on his hip. She described Paul as being in his late teens, approximately five feet eight inches tall, and 155 pounds. He had shoulder-length brown hair with a goatee. He was wearing a black T-shirt with writing on it, "work boot hiking boots," and had an injured left hand. Pam's descriptions led to police sketches of the two, and the police sent out a "be-on-the-lookout" (BOLO) order for the perpetrators and for John Edwards' blue Geo Metro automobile.
Additionally, Officer Bibb testified that he went to the crime scene that Sunday and was briefed on what happened and given a description *855 of the two perpetrators. He met with Pam later that night and was told that Paul had a chipped tooth, wore an earring, and wore leggings and shoes together. When Bibb arrived at work on Monday morning, he received information that the Geo Metro was found in a parking lot near a Napa store and that two men fitting the description were walking behind that store. Officer Bibb then drove to that area, and the woman who called in about the two men told him that the men were walking south. Officer Bibb testified that he then found the two several blocks from the store. Even though their backs were to him, there were several things about the two men which matched the descriptions given the police: the camouflaged clothing, the hair, and the shoes Paul was wearing. Bibb then testified that when he and another officer yelled "police" and the two suspects turned around, their appearance and facial hair matched Pam's description completely. Cole and Paul were instructed to lie on the ground, and Bibb could then see that Cole was wearing a belt with "K.C." on it. Other police officers then arrived at the scene, handcuffed the two, and patted them down. Officers recovered several items, including a knife and several items of John Edwards' personal property including his social security card, a credit card, and an ATM card. After hearing the evidence, the trial court denied the motion to suppress.
On appeal, Cole contends that when he was arrested, the police did not have probable cause or a reasonable suspicion to detain him. While Cole concedes that a witness's detailed description coupled with proximity to time and place of a crime can furnish probable cause to make an arrest, such was lacking here because when officers first encountered Cole, his back was to the officers. Consequently, he argues, the officers could not have known that Cole was the person for whom they were looking. We disagree.
The standard for determining whether a law enforcement officer has probable cause to make a legal arrest is whether the officer has reasonable grounds to believe that the person has committed a felony. Blanco v. State, 452 So.2d 520, 523 (Fla. 1984). When reviewing a trial court's determination of a motion to suppress, an appellate court will look to all of the surrounding facts and circumstances in the light most favorable to sustaining the lower court's ruling. Terry v. State, 668 So.2d 954, 958 (Fla. 1996). In this case, officers had a detailed physical description of Cole and Paul, their clothing, and the crime. As detailed above, when the police were informed that the two were in the area near where the stolen car was found, they located the two and personally observed that the two fit Pam's physical description. Based on these circumstances, we affirm the trial court's order denying the motion to suppress. See State v. Hester, 545 So.2d 493, 494 (Fla. 3d DCA 1989); cf. Carroll v. State, 636 So.2d 1316, 1317-18 (Fla. 1994) (police had reasonable suspicion to detain suspect who was seen walking on deserted highway near victim's abandoned truck).
We similarly find no impropriety in the trial court's ruling on the introduction of an oak walking stick which was purportedly the one Paul carried prior to the attack. The stick was found in the area of the assault and near to where John Edwards' body was found. Pam Edwards testified that it matched the characteristics of the one which Paul carried. The trial court found that the lack of blood or hair found on the stick related to its weight rather than its admissibility. We agree with the trial court that this evidence was relevant and admissible to explain the entirety of the criminal episode. See § 90.402, Fla. Stat. (1993).
We summarily address and reject several of Cole's remaining issues. We find no merit in Cole's issue ten that the trial court erred in failing to provide the jury with several requested instructions in both the guilt and penalty phases of the trial. Similarly, we find no merit to Cole's issue eleven that the trial court erred in allowing the State to proceed on both a premeditated and felony-murder theory since the jury returned a general verdict of first-degree murder. Lovette v. State, 636 So.2d 1304, 1307 (Fla. 1994). In light of Cole's failure to raise a contemporaneous objection, we find procedurally barred Cole's issue twelve that the trial court erred in its imposition of restitution. Last, we summarily reject Cole's issue *856 fourteen that section 921.141, Florida Statutes (1993), is unconstitutional. See Hunter v. State, 660 So.2d 244, 252 (Fla.1995), cert. denied, ___ U.S. ___, 116 S.Ct. 946, 133 L.Ed.2d 871 (1996).
We have reviewed the record and find that it contains competent, substantial evidence to support Cole's convictions. Accordingly, we affirm each conviction. Additionally, we affirm the death sentence. However, in issue thirteen, Cole contends and the State concedes that the trial court erred in sentencing Cole to a twenty-five year minimum mandatory sentence for each of the other felony convictions. We therefore remand this case to the trial court to impose an appropriate sentence for each of the remaining convictions for which Cole was adjudicated guilty.
It is so ordered.
KOGAN, C.J., and OVERTON, SHAW, GRIMES, HARDING, WELLS and ANSTEAD, JJ., concur.
NOTES
[1] The trial court found the following aggravators: (1) Cole had previously been convicted of another felony; (2) the murder was committed during the course of a kidnapping; (3) the murder was committed for pecuniary gain; and (4) the murder was heinous, atrocious, or cruel.
[2] The trial court found and weighed the following nonstatutory mitigators: (1) Cole suffered from organic brain damage and mental illness, slight to moderate weight; (2) Cole suffered an abused and deprived childhood, slight weight.
[3] These issues are: (1) whether the trial court abused its discretion in allowing a portion of Pam Edwards' testimony to be read back to the jury; (2) whether the trial court erred in conducting portions of the trial in the defendant's absence; (3) whether the jury's sentencing recommendation was tainted by improper victim impact testimony; (4) whether the death penalty is proportionate; (5) whether the trial court erred in denying Cole's motion for mistrial after a witness referred to Cole's "history"; (6) whether the trial court erred in denying Cole's motion for change of venue; (7) whether the trial court erred in overruling Cole's objection to the introduction of several photographs; (8) whether the trial court erred in denying Cole's motion to suppress; (9) whether the trial court erred in admitting a stick purported to be the one carried by Paul; (10) whether the trial court erred in failing to adequately instruct the jury; (11) whether the trial court erred in denying Cole's pretrial motions not to allow the State to proceed on both premeditated and felony murder; (12) whether the trial court erred in imposing an order of restitution which included travel expenses for a State witness; (13) whether Cole's sentences on the noncapital offenses are illegal; and (14) whether section 921.141, Florida Statutes (1993), is constitutional.
[4] We also reject Cole's contention that his rights were violated when he was absent from a conference requested by Paul's attorney regarding threats Cole made to Paul. At the time of the hearing, Cole's trial was severed from Paul's trial, and the hearing had only to do with whether Paul's safety required that Paul be moved to another jail. Therefore, Cole's contention is meritless. In addition, we find meritless Cole's blanket assertion that he was prejudiced by apparently not being present at numerous unidentified status conferences.
[5] In Nibert, the trial court found the physical and psychological abuse of the defendant's youth to be "possible" mitigation but dismissed the mitigation. Nibert, 574 So.2d at 1062.
[6] We additionally find the standard jury instruction on nonstatutory mitigation was sufficient. See Jones v. State, 612 So.2d 1370, 1375-76 (Fla. 1992).
[7] Specifically, Cole objects to three photographs which show John Edwards' body as found at the crime scene. State's exhibit 20 is a photograph of how Edwards was covered when first found by police; State's exhibit 21 is a close-up photograph of the back of Edwards' head; and State's exhibit 22 is a photograph of Edwards' upper torso from a different angle.
[8] Specifically, Cole claimed that the following photographs were duplicative and unduly prejudicial: State's exhibit 39, a photograph of Edwards' upper torso when the medical examiner first received the body; and State's exhibit 40, a companion photograph of exhibit 39, showing Edwards' lower torso. Cole made the same objection to the following photographs: State's exhibit 45, a photograph of the body after it had been cleaned, which demonstrated a neck wound and injury to the right ear; State's exhibit 56, a close-up photograph of the neck wound showing a superficial cut to the skin on the left side of the neck; and State's exhibit 57, a close-up photograph of the neck wound showing the depth of the cut by showing the thyroid cartilage. Additionally, Cole objected to the introduction of State's exhibit 55, a photograph showing the undersurface of Edwards' scalp and the extent of the bruising to the scalp not visible from the surface. The medical examiner testified that this photograph also demonstrated that Edwards was alive at the time he received these blows to the head.