29 So.3d 1093 (2010)
Alwin C. TUMBLIN, Appellant,
v.
STATE of Florida, Appellee.
No. SC07-2111.
Supreme Court of Florida.
February 25, 2010.
*1095 Carey Haughwout, Public Defender, and Paul E. Petillo, Assistant Public Defender, Fifteenth Judicial Circuit, West Palm Beach, FL, for Appellant.
Bill McCollum, Attorney General, Tallahassee, FL, Lisa-Marie Lerner and Leslie Campbell, Assistant Attorneys General, West Palm Beach, FL, for Appellee.
PER CURIAM.
Alwin C. Tumblin appeals from a judgment of conviction of first-degree murder and a sentence of death, as well as a conviction for robbery with a firearm. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons set forth below, we reverse the convictions, vacate the sentence of death, and remand for a new trial. We conclude that reversible error occurred in the guilt phase of the trial, which affected both the guilt phase and the penalty phase, when a police officer gave his opinion of the truthfulness of a key State witness.

FACTS AND PROCEDURAL HISTORY

Overview
This case involves the May 24, 2004, murder of Jimmy Johns, the owner of Jimmy's Auto Clinic in Fort Pierce, Florida. Forensic Pathologist and District Medical Examiner Dr. Roger Mittleman testified that Jimmy Johns died as a result of a bullet that entered the left side of his head, traveled through his brain, and lodged in the right rear portion of his brain. Gun powder stippling on the left side of Johns' head indicated a close but not contact gun shot.
On the day of the murder, Elizabeth Hobson, who worked at the Auto Zone store across from Jimmy's Auto Clinic, heard a gunshot as she was leaving for lunch. She saw Johns lying on the floor of his shop, and then she saw a short, stocky black "kid" running from the shop with a white towel in his hand. A minute or so later, she saw another black man come out of the shop and leave in a yellow car that looked like a retired taxicab. Another witness, Susan Ooley, also saw a yellow taxicab-like car parked near the auto shop at the time of the murder. She saw someone running from the shop but did not see anything in his hand. Employees of the shop returned from lunch a little after 1 p.m. and found Johns' body.
Alwin C. Tumblin, age twenty-five at the time, was ultimately indicted and convicted for the murder as well as the armed robbery of Johns. During the investigation, Tumblin's friend, Anthony Mayes, was also considered to be a suspect. When finally located by Sheriff's Department Lieutenant Dennis Smith, Mayes was handcuffed and taken into custody. He immediately said he wanted to talk, but only to Lieutenant Smith, who had previously spoken with his grandmother. Mayes was taken to the Fort Pierce police station where he *1096 was advised of his Miranda[1] rights. He was informally interviewed by Lieutenant Smith before giving a taped interview to Detective Joe Coleman and State Attorney Investigator Jeff Hamrick.[2] Mayes' statements to police implicated Tumblin as the planner of the crimes and as the person who shot Jimmy Johns. No DNA evidence linked Tumblin directly to the murder. The only eyewitness who testified that Tumblin shot Johns was Mayes, who entered a plea to second-degree murder and agreed to testify at trial in exchange for a maximum sentence of twenty years. We discuss the evidence in detail because an error occurred in the guilt phase, during Lieutenant Smith's testimony concerning the statements made by Mayes, which deprived Tumblin of a fair trial.

Trial Testimony
Jimmy Johns was the owner and operator of Jimmy's Auto Clinic. On the morning of May 24, 2004, Tumblin, his girlfriend Theresa York, and his friend Anthony Mayes, were at the home of Tumblin's sister, Rhonda Tumblin. At the time, Tumblin and York were both staying in Rhonda's home and sleeping in her bedroom. Mayes testified that Tumblin began "boosting" him up that morning, or attempting to persuade him to participate in a robbery and that Tumblin said he would pay Mayes $300 to act as a lookout. Mayes testified that he heard Tumblin tell York to call Wal-Mart about some bullets and that Tumblin and York then left for a short time. Mayes testified that Tumblin and York later returned to Rhonda's home and, sometime around noon on May 24, Tumblin and Mayes left in York's yellow Grand Marquis automobile, which looked like a retired taxicab. Mayes testified that Tumblin took a gun from the waistband of his pants and placed it under the seat of the car, and that Tumblin commented during the ride that "he was gonna kill everybody that exists as if whoever is in there."[3] According to Mayes, they proceeded to Jimmy's Auto Clinic with Tumblin driving and Mayes in the passenger seat, a trip that took about twenty to twenty-five minutes. On arrival, Tumblin parked the car in front and walked into the auto shop. Mayes testified that he followed Tumblin into the shop where they waited outside the shop office while Johns completed a telephone call.
Mayes testified that when Johns approached them, Tumblin first asked him about a car part but then asked, "Where is it at?" When Johns indicated that he did not understand, Tumblin asked, "Where is the money at?" Mayes testified that after Johns gave Tumblin money and a money clip from his pocket, Tumblin pulled the gun from the back of his pants waistband and held it to Johns' head. Mayes reported that Tumblin asked Johns, "What you think about this?" According to Mayes, Tumblin then pulled the trigger, killing Johns, who was sixty-seven years old. Mayes said that as he started to run away, he saw Tumblin go toward Johns' office, where it was later discovered that envelopes with checks to pay the shop's bills were missing.
When Tumblin returned to his sister's house, Jean Nicole Ruth, a friend of Mayes, heard Tumblin say, "The cracker *1097 dead and Head [Mayes' nickname] ran." Jean Nicole Ruth also testified that when Tumblin returned, she saw him with some papers and envelopes. She said York and Rhonda opened the envelopes and Rhonda took them outside, along with a pan. Although she did not see it, she concluded that Rhonda burned them in the backyard. No envelopes, checks or burnt remains were ever recovered. Later, Rhonda Tumblin borrowed Jean Nicole Ruth's yellow Buick to go to Rhonda's aunt's house. On the way, Rhonda was hailed down by Tumblin, who was on foot next to the road, and by York, who was standing across the street. Rhonda picked up Tumblin and York in the Buick and they drove to Tumblin's aunt's house. In the meantime, based on reports from witnesses at the scene, the police were looking for a yellow car that looked like a retired taxicab. When Tumblin, his sister, and York arrived at the aunt's house, they found no one home but, while there, were approached by the police, who inquired about the names of the driver and passengers. Tumblin's sister was then allowed to drive away with Tumblin and York, but about ten minutes later, when they drove into an Amoco station, the car was surrounded by police, who took them to the police station. This second stop was the result of a police helicopter spotting another yellow car, the car that resembled a taxicab, parked behind Rhonda Tumblin's house. Tumblin's sister testified that as they were driving to the gas station, they saw the helicopter and Tumblin said, "The cracker must be dead."
When the police went to Rhonda's house to investigate, Officer Kathleen Murphy saw a black woman flee the home through a window. The woman was later identified as Jean Nicole Ruth. A search warrant was obtained to search the house, and the search revealed a .32 caliber revolver under some clothes on a chair in the room where Tumblin and York had been sleeping. Four Remington-Peters bullets were found under a pillow on a bed. Evidence at trial showed that at 9:53 a.m. on May 24, 2004, a person with a birth date of November 11, 1981, bought Remington-Peters ammunition at the Fort Pierce Wal-Mart. Theresa York's birth date, according to her driver's license, is November 11, 1981.
Fort Pierce police officer Hall Soloman found an expended pistol cartridge lying outside the auto repair bay door at the crime scene and found an unfired Remington-Peters bullet inside the doorway of the bay. Mark Chapman, firearms expert with the Indian River Crime Laboratory, testified that the bullet removed from Johns' brain and the cartridge casing found at the scene were fired from the same .32 caliber revolver found in the search of Tumblin's sister's home.[4]

The Verdict and Sentence
On a special verdict form, the jury found Tumblin guilty of both premeditated and felony murder. The jury also found him guilty of robbery with a firearm. The case proceeded to the penalty phase on June 25, 2007, after which the jury unanimously recommended a sentence of death. In the sentencing order entered on September 25, 2007, the court found the following aggravators: (1) Tumblin had prior convictions for felonies involving the use or threat of violence (great weight); (2) the murder was committed while the defendant was engaged in commission, attempt to commit, or flight after commission of a robbery, merged with the aggravator that *1098 the murder was committed for pecuniary gain (great weight); and (3) the murder was committed in a cold, calculated, and premeditated manner without pretense of moral or legal justification (CCP) (great weight). The trial court found no statutory mitigation but did find nonstatutory mitigation as follows: (1) poor family life Tumblin grew up in a dysfunctional family characterized by abuse and neglect (impoverished abusive environment) (some weight); (2) poor mental statebelow-average intelligence, behavioral disorders, antisocial impulsive conduct, adolescent brain injury, and suicidal behavior (little weight); (3) Tumblin loves his mother and sister and his children, and they love him in return (little weight); and (4) Tumblin was well-behaved during trial and the penalty hearing (very little weight). We turn now to the guilt phase issues raised by Tumblin.

ISSUES ON APPEAL
Tumblin raises three guilt phase issues in this appeal.[5] We discuss two of these issues in detailthe admission of Anthony Mayes' prior consistent statement through the testimony of Lieutenant Smith and Smith's testimony that essentially vouched for Mayes' truthfulness. While we reverse based on the second issue, we also discuss the first issue because both arose out of Smith's testimony relating to Anthony Mayes. We do not reach the third guilt phase issue because it is not an issue that is likely to reoccur in the retrial of this case.[6] First, however, pursuant to *1099 our mandatory duty, we must examine the sufficiency of the evidence.

Sufficiency of the Evidence
Before remanding for a new trial, we must analyze the sufficiency of the evidence because if there was insufficient evidence on which to convict Tumblin of this murder, it is our obligation to reverse the convictions with directions to grant judgments of acquittal. See McDuffie v. State, 970 So.2d 312, 329 (Fla.2007). Although Tumblin does not challenge the sufficiency of the evidence in this case, we have a mandatory obligation to review the sufficiency of the evidence in every case in which a sentence of death has been imposed, even if the issue is not raised on appeal. See Jones v. State, 963 So.2d 180, 184 (Fla.2007).
The evidence, the most incriminating of which was presented through the testimony of Anthony Mayes, was sufficient for the jury to find that he and Tumblin went to Jimmy's Auto Clinic to perpetrate a robbery and that, once there, Tumblin demanded and received money from Johns. According to Mayes, Tumblin took a handgun with him in the car and that on the way to the auto shop, Tumblin announced that he planned to kill anyone there who either "existed" or "resisted" Mayes was not sure which word was used. Mayes also testified that after Tumblin was given money by Johns, who did not resist, Tumblin put a gun close to Johns' head and pulled the trigger. The medical examiner testified that Johns died from a single gunshot to his left temple and that gunpowder stippling around the entry wound showed the shot to have been fired from very close range. Thus, sufficient competent, substantial evidence supports the jury's verdict and the judgment of conviction for first-degree murder. We turn now to examination of the testimony of Lieutenant Smith, which we conclude contained error that deprived Tumblin of a fair trial and which necessitates our reversal for a new trial.

The Testimony of Lieutenant Smith
Tumblin contends that the trial court abused its discretion in denying his motion for mistrial made during Lieutenant Dennis Smith's testimony when Smith testified that he told Detective Coleman he thought that Mayes would tell him the truth. As explained below, we agree that a mistrial should have been granted. Tumblin also contends that the trial court abused its discretion in allowing Lieutenant Smith to tell the jury about Mayes' prior statement that was consistent with his trial testimony. Although we do not find merit in this claim, we discuss it in some detail because the content and chronology of the testimony of Mayes and Smith are important to our discussion of this issue.
Mayes testified first and told the jury that Tumblin had convinced him to participate in the robbery and that once at Jimmy's Auto Clinic, Tumblin robbed Johns and without provocation shot him in the head at close range. Later during that same day of trial, Lieutenant Smith, an officer with the St. Lucie County Sheriff's Department, testified that he arrested Anthony Mayes on July 9, 2004. Mayes was anxious to talk to Smith about the crimes and, even though Smith urged Mayes to wait for the other officers in charge of the investigation, Mayes did recount details of the crime first to Smith. Over objection, *1100 the trial court allowed Smith to tell the jury what Mayes told him about the robbery and murder prior to Mayes giving a formal recorded statement on the day he was arrested. Smith testified as follows:
Q. [prosecutor]: Lieutenant, go ahead, what did Mr. Mayes tell you?
A. [Smith]: He told me about being at a house, I believe, on 14th Street earlier in the day, the day of the homicide with the subject he referred to as Man. He told me that Man washe used the term "boosting." I understood that to mean encouraging, persuading him to go do a robbery with Man. That Man and his girlfriend went to Wal-Mart to get a box of ammunition, that they called there first. That Man promised him $300 from the proceeds of the robbery. That he told him thatthat Man told him that if the victim bucked, meaning if he resists or bucked up, that he was gonna cap him.
Q. Go ahead.
A. And that they went to do the robbery. That he saw Man shoot the victim in the head, told us approximately how far away he was when that occurred.
Q. How far away who was?
A. Mayes. How far awayhe told us approximately how far away Mayes was and how far away from the victim Man was when he fired the shot.
Q. How close did he say Man was to the victim when he shot him?
A. As I recall, hehevery close. I think he may have even stuck the gun to his head.
This prior statement was consistent with the trial testimony Mayes had given earlier that day.
"Generally, prior consistent statements are inadmissible to corroborate or bolster a witness's trial testimony" because they are usually hearsay, but a prior consistent statement may be admitted as nonhearsay if certain conditions are met. Taylor v. State, 855 So.2d 1, 22-23 (Fla. 2003). The trial court found that Mayes' prior consistent statement in this case was admissible under section 90.801(2)(b), Florida Statutes (2008). Section 90.801(2)(b), Florida Statutes, provides that prior statements that are "[c]onsistent with the declarant's testimony and are offered to rebut an express or implied charge against the declarant of improper influence, motive, or recent fabrication" are not inadmissible hearsay if the declarant testifies at trial and is subject to cross-examination concerning the statement. § 90.801(2)(b), Fla. Stat. (2008).
In reviewing the trial court's decision to admit Mayes' prior consistent statement in this case, our standard of review is abuse of discretion. See Hudson v. State, 992 So.2d 96, 107 (Fla.2008) (stating that the standard of review of a trial court's decision to admit evidence is abuse of discretion), cert. denied, ___ U.S. ___, 129 S.Ct. 1360, 173 L.Ed.2d 621 (2009). We conclude that under the circumstances in this case, the trial court did not abuse its discretion when it allowed Smith to testify about Mayes' prior statement, which was consistent with Mayes' trial testimony. Defense counsel's earlier cross-examination of Mayes first suggested that Mayes' taped statement was only a regurgitation of what Smith had prompted him to say. Other portions of the cross-examination suggested that Mayes was testifying falsely against Tumblin in order to preserve a favorable plea agreement he reached with the State sometime after he gave his initial statements. Defense counsel cross-examined Mayes about the details of his plea agreement and implied that Mayes testified at trial as he did against Tumblin in order to preserve his *1101 favorable plea deal and twenty-year sentence.
The cross-examination of Mayes impliedly charged that Mayes testified as he did at trial due to improper influence and that his trial testimony was a recent fabrication intended to preserve his plea deal. Both of these grounds are a basis for admission of prior consistent statements under section 90.801(2)(b), Florida Statutes. Thus, the admission of Mayes' prior consistent statement was not an abuse of discretion. See Chamberlain v. State, 881 So.2d 1087 (Fla.2004) (holding prior consistent statement admissible where it was made after the codefendant was arrested but before plea negotiations with the State because defense counsel implied witness was testifying against the defendant to protect a favorable plea deal and sentence); Rodriguez v. State, 609 So.2d 493, 500 (Fla.1992) (holding prior consistent statements admissible because "[d]efense counsel's references to plea agreements with the state during cross-examination [of the witness] were sufficient to create an inference of improper motive to fabricate"); Jackson v. State, 599 So.2d 103, 107 (Fla.1992) (holding that a prior consistent statement was admissible to rebut the inference that the codefendant had a motive to fabricate in light of agreement to testify against Jackson). Although we find that the trial court did not abuse its discretion in allowing Lieutenant Smith to testify about Mayes' prior consistent statement, that testimony plays a part in our separate determination that other testimony given by Smith, for which Tumblin sought a mistrial, requires a new trial.
During Lieutenant Smith's direct examination testimony, immediately after Smith recounted Mayes' prior consistent statement to the jury, the following colloquy occurred:
Q. [prosecutor to Lt. Smith] Did you then recount that or summarize that statement that he gave you to Detective Coleman and Investigator Hamrick when they returned?
A. [Lt. Smith] Yes.
Q. Did you  when you recounted this  when you recounted his version, did you add anything or suggest anything he should say in the future?
A. Only  no, nothing in particular that he should say. I did assure Detective Coleman in front of Mayes that I felt like Mayes would  would tell him the truth.

(Emphasis added.) Tumblin's counsel objected to this comment on Mayes' veracity, and the trial court struck the comment. The trial court agreed with Tumblin that Smith "was vouching to another officer that he felt like [Mayes] was going to tell him the truth."
"[A]llowing one witness to offer a personal view on the credibility of a fellow witness is an invasion of the province of the jury to determine a witness's credibility." Seibert v. State, 923 So.2d 460, 472 (Fla.2006) (quoting Knowles v. State, 632 So.2d 62, 65-66 (Fla.1993)). "It is clearly error for one witness to testify as to the credibility of another witness." Acosta v. State, 798 So.2d 809, 810 (Fla. 4th DCA 2001). Moreover, "[i]t is especially harmful for a police witness to give his opinion of a witnesses' [sic] credibility because of the great weight afforded an officer's testimony." Seibert, 923 So.2d at 472 (quoting Page v. State, 733 So.2d 1079, 1081 (Fla. 4th DCA 1999)); see also Acosta, 798 So.2d at 810. "Police officers, by virtue of their positions, rightfully bring with their testimony an air of authority and legitimacy. A jury is inclined to give great weight to their opinions. ..." Bowles v. State, 381 So.2d 326, 328 (Fla. 5th DCA 1980); see also Lee v. State, 873 So.2d 582, *1102 583 (Fla. 3d DCA 2004) (holding police officer's comment that witness was credible and positive in her pretrial lineup identification was error requiring new trial); Olsen v. State, 778 So.2d 422, 423 (Fla. 5th DCA 2001) ("[I]t is considered especially harmful for a police officer to give his or her opinion of a witness' credibility because of the great weight afforded an officer's testimony."); cf. Perez v. State, 595 So.2d 1096, 1097 (Fla. 3d DCA 1992) (stating that improper admission of police officer's testimony to bolster the credibility of a witness cannot be deemed harmless).
The case of Acosta v. State is illustrative of the similar problem we face in this case. In Acosta, the district court reversed the conviction for uttering a forged instrument and grand theft because of a statement by a police officer witness that bolstered the credibility of a key state's witness, Sarah Riley, who had been involved with Acosta in the crimes. 798 So.2d at 809. When the officer was asked why a handwriting sample was not taken from Riley, he responded, "Up until that point, everything Sarah Riley told me appeared to be truthful." Id. Acosta's motion for mistrial was denied but the court gave a curative instruction to the jury to disregard the comment. Id. The Fourth District held that it is clear error for one witness to offer his personal view on the credibility of a fellow witness, especially where the witness offering the view is a police officer, because of the great weight accorded an officer's testimony. Id. at 810. In reversing, the district court held:
Riley was the key witness for the state, and the state's case hinged primarily on her credibility. She was an admitted participant in the crime, but was not charged. She testified that she had not, but that the appellant had forged the check. The state's handwriting expert could only corroborate her testimony to the extent he believed it was "probable" that it was appellant's handwriting. He found significant similarities between the signature on the check and appellant's handwriting, and dissimilarities which could not be accounted for. This expert has various classifications which he uses to explain the strength of his opinion, and this classification was third from the strongest.
Because Riley's testimony was crucial and the defense's main emphasis was on her lack of credibility, we cannot agree with the State that the error was harmless or that it was cured by the instruction. We therefore reverse and remand for a new trial.
Id. Similarly, in the instant case, the trial court sustained the objection, struck the comment, and later gave a curative instruction.[7] Even so, as we explain below, we conclude that the curative measures did not erase the taint of the testimony and, as a result, the trial court abused its discretion in denying Tumblin's motion for mistrial. "The giving of a curative instruction will often obviate the necessity of a mistrial. However, there are some instances in which the prejudice is so great that it is impossible `to unring the bell.'" Graham v. State, 479 So.2d 824, 825-26 (Fla. 2d DCA 1985) (citation omitted).
*1103 "[T]his Court reviews a trial court's ruling on a motion for mistrial under an abuse of discretion standard." Salazar v. State, 991 So.2d 364, 371 (Fla. 2008), cert. denied, ___ U.S. ___, 129 S.Ct. 1347, 173 L.Ed.2d 614 (2009); see also Perez v. State, 919 So.2d 347, 363 (Fla.2005); Floyd v. State, 913 So.2d 564, 576 (Fla.2005). The motion should be granted "only when it is necessary to ensure that the defendant receives a fair trial." Salazar, 991 So.2d at 372 (quoting Cole v. State, 701 So.2d 845, 853 (Fla. 1997)). In the present case, as the trial court noted:
Other than Anthony Mayes, is there any evidence that Alwin Tumblin shot Jimmy Johns? The answer is no, it's all circumstantial and nobody puts him on the scene, nobody sees what happened, nobody saw him with a gun that day, nobody said he drove over there that day. Everything that places him at the scene and committing that murder comes from Anthony Mayes.
The trial court also questioned whether the State could prove premeditation without Mayes' testimony. Smith's testimony concerning Mayes' truthfulness occurred after the jury heard Mayes' version of events, which also matched Mayes' prior consistent statement related by Smith to the jury. Because Mayes gave the same version of events to Lieutenant Smith informally that he testified to at trial, Smith's vouching for his truthfulness could be reasonably inferred by the jury to extend to Mayes' veracity at trial. Under these circumstances and the facts of this case, in which Mayes gave the only eyewitness testimony that Tumblin committed the murder and did so in a premeditated manner, we conclude that the trial court abused its discretion in denying the motion for mistrial.
We also find that Mayes' critical eyewitness testimony in the guilt phase was an essential component of the evidence of aggravation relied upon by the State and the court in the penalty phase. The trial court found that the murder was committed in a cold, calculated, and premeditated manner (CCP) based in large part on Mayes' testimony that Tumblin took a gun from the waistband of his pants and coldly aimed it at Johns, asking, "What you think about this?" This evidence came solely from Mayes. The trial court also relied on Mayes' testimony that Tumblin convinced him to commit the robbery and be a lookout. Again, this fact came only from Mayes. In finding CCP, the trial court also relied on Mayes' testimony that on the way to Jimmy's Auto Clinic, Tumblin told Mayes he would kill everybody "that exists" there. The trial court noted evidence from Mayes that he did not know where the robbery would occur and Tumblin had chosen the target business in advance. The trial court also cited testimony that came only from Mayes that Johns did not resist in any way before being shot.
The heavy reliance by the trial court on testimony given by Mayes in establishing CCP is summed up in the following excerpt from the sentencing order:
In the days, hours and minutes preceding this robbery and murder, the Defendant procured a firearm, obtained ammunition, secured an accomplice (Anthony Mayes), stayed at his sister's house in Fort Pierce the night before, drove to Jimmy's Auto Clinic with Anthony Mayes proclaiming that he would commit murder in the process, found Jimmy Johns alone at Jimmy's Auto Clinic, robbed him without incident and then shot him in the head, execution-style. It is noteworthy that neither the Defendant nor Anthony Mayes attempted to disguise their identities. Further, *1104 the Defendant chose to drive to and flee from the murder scene in an emphatically distinct, yellow taxicab-looking car. Also, the Defendant engaged the victim in a conversation about a car part before asking Mr. Johns where the money is. In this otherwise well-planned and orchestrated "robbery" the Defendant took no precautions to prevent or minimize his identification by any would-be victim. To be sure, he had no intentions of leaving any survivors as further evidenced by his statement to Anthony Mayes before the robbery and murder [that he would kill anyone who exists there].
Thus, it can be seen that Anthony Mayes' testimonyand his credibility before the jury and the courtwas instrumental in the jury finding Tumblin guilty of first-degree premeditated and felony murder and in the trial court finding that the murder was cold, calculated, and premeditated. Because Lieutenant Smith improperly volunteered testimony that essentially vouched for Mayes' credibility in a manner that tied his credibility both to the version of events Mayes gave to officers prior to trial and to the same version of events he gave the jury during trial, we conclude that Tumblin did not receive a fair trial. Although the trial court correctly recognized the error, struck the testimony, and later gave a curative instruction, these corrective measures could not erase the inescapable impression upon the jury that Lieutenant Smith believed the version of events testified to by Mayes was truthful.
Under the facts and circumstances present in this case, we find that Smith's testimony that he believed Mayes would tell the truth deprived Tumblin of a fair trial. We are thus constrained to reverse and remand for a new trial. This reversal and remand for a new trial obviates the need for us to reach any of the penalty phase claims or the issue of proportionality in this case.

CONCLUSION
Accordingly, for the reasons explained above, we reverse Tumblin's convictions and sentences, and we remand for a new trial.
It is so ordered.
QUINCE, C.J., and PARIENTE, LEWIS, LABARGA, and PERRY, JJ., concur.
CANADY, J., dissents with an opinion, in which POLSTON, J., concurs.
CANADY, J., dissenting.
I disagree with the majority's conclusion that the trial court's denial of Tumblin's motion for mistrial constituted an abuse of discretion. I would affirm Tumblin's convictions and sentences because I conclude that there is no basis for reversal.
Under the abuse of discretion standard that governs our review of the trial court's denial of the mistrial motion, "the trial court's ruling should be sustained unless no reasonable person would take the view adopted by the trial court." Overton v. State, 801 So.2d 877, 896 (Fla.2001). A trial court should grant a motion for mistrial "only when the error committed was so prejudicial as to vitiate the entire trial." Cobb v. State, 376 So.2d 230, 232 (Fla. 1979). That is, declaring a mistrial is appropriate only when doing so "is necessary to ensure that the defendant receives a fair trial." Cole v. State, 701 So.2d 845, 853 (Fla.1997). "In this State the rule has been long established and continuously adhered to that the power to declare a mistrial and discharge the jury should be exercised with great care and caution and should be done only in cases of absolute necessity." Salvatore v. State, 366 So.2d 745, 750 (Fla.1978); see also England v. *1105 State, 940 So.2d 389, 402 (Fla.2006); Pagan v. State, 830 So.2d 792, 814 (Fla.2002); Thomas v. State, 748 So.2d 970, 980 (Fla. 1999).
Given this rule, which governed the trial court's consideration of the motion for mistrial, it is unwarranted to conclude that "no reasonable person would take the view adopted by the trial court" in denying the motion. Overton, 801 So.2d at 896.
I acknowledge that this Court has recognized that allowing "a police witness to give his opinion of a witness['s] credibility" is "especially harmful." Seibert v. State, 923 So.2d 460, 472 (Fla.2006) (quoting Page v. State, 733 So.2d 1079, 1081 (Fla. 4th DCA 1999)). The special concern associated with such improper testimony does not, however, justify a categorical rule that such errors are remediable only by declaring a mistrial. The error should instead be assessed within the context of the trial to determine whether corrective action short of a mistrial is sufficient to avoid a prejudicial impact that vitiates the entire trial. As with other errors, such improper testimony justifies a mistrial "only in cases of absolute necessity." Salvatore, 366 So.2d at 750.
Here, the context supports the conclusion that a reasonable trial judge could decide that striking the improper testimony and giving a curative instruction would be adequate "to ensure that the defendant receive[d] a fair trial". Cole, 701 So.2d at 853. The single reference to Mayes' credibility was indirect and apparently uncalculated. We have previously held that where an improper reference "was isolated and appear[ed] to have been inadvertent," "[t]he trial court was well within its discretion to determine that the statement did not prevent [the defendant] from having a fair trial." Merck v. State, 664 So.2d 939, 941 (Fla.1995).
Although Mayes' testimony clearly was a significant part of the State's case against Tumblin, it is unjustified to conclude that "the state's case hinged primarily on [Mayes'] credibility." Acosta v. State, 798 So.2d 809, 810 (Fla.App.2001) (emphasis added). Substantial evidence other than Mayes' testimony was presented to show not only that Tumblin was involved in the robbery and murder but also that Tumblinrather than Mayes shot the victim. Jean Nicole Ruth testified that Tumblin made statements shortly after the crimes occurred implicating himself in the shooting. Tumblin's sister Rhonda gave testimony establishing that Tumblin owned and possessed the murder weapon prior to the crimes. The evidence at trial also established that shortly after the crimes, the murder weapon was found in Tumblin's bedroom in Rhonda's house, a location to which Tumblinand not Mayeshad returned after the murder. Accordingly, even if Acosta was correctly decided, the instant case is distinguishable.
The trial court did not abuse its discretion in determining that Tumblin was not entitled to a mistrial. The convictions and sentences should be affirmed.
POLSTON, J., concurs.
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[2] Lieutenant Smith was with the Sheriff's Department but was working with the Fort Pierce Police Department in a violent crimes unit.
[3] Mayes explained that Tumblin said he would kill anyone who "existed" or "resisted" in the shopMayes could not recall which term was used. Mayes told Lieutenant Smith that Tumblin said he would kill anyone who "bucked."
[4] Although the murder weapon was a revolver, which normally retains the spent cartridges in the chambers, the evidence showed that the cylinder of this revolver was faulty and would fall open if not manually held closed.
[5] The guilt phase issues raised by Tumblin are: (1) whether the trial court erred in letting Lieutenant Smith, a senior police officer, testify to Anthony Mayes' prior consistent statement; (2) whether the trial court abused its discretion in denying Tumblin's motion for mistrial when Lieutenant Smith testified that he told another officer that Anthony Mayes would tell him the truth; and (3) whether the trial court reversibly erred in failing to conduct a proper hearing pursuant to Richardson v. State, 246 So.2d 771 (Fla.1971), after the State failed to disclose that Jean Nicole Ruth had recently been shot in an unrelated incident and was taking hydrocodone medication at the time of her testimony.

The penalty phase issues raised in this appeal, but not reached in this opinion are: (1) whether the court erred in instructing the jury and in finding that the homicide was committed in a cold, calculated, and premeditated manner; (2) whether the court failed to properly find and evaluate mental mitigation; (3) whether the death penalty is disproportionate; (4) whether the court erred in allowing Tumblin to choose the penalty phase witnesses; (5) whether the court properly evaluated admissible hearsay evidence in the penalty phase; (6) whether the court erred in overruling Tumblin's objection to victim impact evidence that Johns' wife suffered a stroke; (7) whether the court erred in allowing aggravation evidence of prior felonies that were not violent felonies; and (8) whether the court erred in denying Tumblin's special verdict form and instructions for aggravators.
[6] During the testimony of Jean Nicole Ruth, it was disclosed before the jury that she had recently been shot in an incident unrelated to the case and was taking hydrocodone medication at the time of her testimony. Although we do not discuss the third guilt phase claim, we remind trial judges that in conducting a Richardson inquiry after a discovery violation has occurred, the court should make express findings concerning whether the discovery violation (1) was willful or inadvertent; (2) was substantial or trivial; and (3) had a prejudicial effect on the aggrieved party's trial preparation. Richardson, 246 So.2d at 775. We also remind prosecutors and defense attorneys that any fact that can reasonably be found to bear on a witness's ability or competency to testify clearly is relevant and subject to discovery. See, e.g., Edwards v. State, 548 So.2d 656, 658 (Fla. 1989) (evidence of drug use for the purpose of impeachment is admissible if it can be shown that the witness is using drugs at or about the time of the testimony itself or it is expressly shown by other relevant evidence that prior drug use affects the witness's ability to observe, remember, and recount); § 90.608(4), Fla. Stat. (2009) (any party may attack the credibility of a witness by "[s]howing a defect of capacity, ability, or opportunity in the witness to observe, remember, or recount the matters about which the witness testified").
[7] The trial court took the motion for mistrial under advisement over the weekend and, after considering additional research and argument of counsel, denied the motion on the following Monday. Consequently, the curative instruction was given several days after Lieutenant Smith's actual testimony and made no specific reference to Smith's testimony. It simply advised the jury, "You are hereby instructed that the believability or credibility of all witnesses testifying in this case is within the exclusive province of the jury. Please disregard any suggestion to the contrary."